**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| NICHOLAS BROWN, individually and on behalf of all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> KALSHI INC., <br><br> *Defendant.* | Case No. 2:26-cv-1426-LK <br><br> **DEFENDANT KALSHI INC.'S MOTION TO DISMISS THE COMPLAINT AND, IN THE ALTERNATIVE, TO STRIKE THE CLASS ALLEGATIONS** <br><br> Hon. Lauren King <br><br> NOTE ON MOTION CALENDAR: October 16, 2026 <br><br> **Oral Argument Requested** |

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 3

BACKGROUND ......................................................................................................... 4

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................... 9

I.  THE COURT LACKS PERSONAL JURISDICTION OVER KALSHI ........................... 9

II. PLAINTIFF FAILS TO STATE A CLAIM .................................................................. 11

    A.  Plaintiff's CEMA Claim Fails For Multiple Independent Reasons ...................... 11

    B.  Plaintiff's Derivative CPA Claim Fails For The Same Reasons .......................... 18

III. CEMA RUNS AFOUL OF THE CONSTITUTION ............................................................ 18

    A.  CEMA's Prohibition On Upstream Speech Is Facially Unconstitutional ............. 19

        1.  CEMA Facially Reaches Protected Upstream Composition ..................... 19

        2.  Liability For Upstream Speech Fails *Central Hudson* In All Applications ................................................................................................. 19

            (a)  No Governmental Interest Attaches Upstream ............................. 20

            (b)  The Restriction Does Not Advance Any Interest ......................... 20

            (c)  Less Restrictive Alternatives Are Always Available ................... 21

        3.  The Proper Remedy Is Severance Of Liability For Upstream Speech ................................................................................................. 21

    B.  In The Alternative, CEMA Cannot Constitutionally Be Applied To Kalshi's Composition Of An Editable Referral Template ................................... 22

IV. THE CLASS ALLEGATIONS SHOULD BE STRICKEN ........................................... 22

CONCLUSION ............................................................................................................. 24

DEFENDANT'S MOTION TO DISMISS & TO STRIKE      i      QUINN EMANUEL URQUHART & SULLIVAN LLP
CASE NO. 2:26-CV-1426                                1109 FIRST AVENUE, SUITE 210
                                              SEATTLE, WASHINGTON 98101
                                                Tel: (206) 905-7000

## NOTICE OF MOTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 16, 2026, or at the next date and time that is available for the Court, defendant Kalshi Inc. ("Kalshi") will move this Court to dismiss the Class Action Complaint (ECF No. 1) for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), for failure to state a claim under Rule 12(b)(6), and on First Amendment grounds as well as, in the alternative, to strike the Complaint's class allegations. Kalshi so moves based on the following Memorandum of Points and Authorities, the argument of counsel, and any additional materials as may be submitted to and accepted by the Court before its decision.

Dated: July 17, 2026

By: */s/ Matthew Hosen*
Matthew Hosen
matthosen@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Tel: (206) 905-7000
Fax: (206) 905-7100

Avi Perry*
aviperry@quinnemanuel.com
Rachel Frank Quinton*
rachelquinton@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8000
Fax: (202) 538-8100
(*Admitted *Pro Hac Vice*)

John W. Baumann*
jackbaumann@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

1

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

Los Angeles, California 90017
Tel: (213) 443-3000
Fax: (213) 443-3100
(*Admitted *Pro Hac Vice*)

Nicolas G. Keller*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

2

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Plaintiff has sued under Washington's Commercial Electronic Mail Act ("CEMA") and Consumer Protection Act ("CPA") because he allegedly received a single electronic text message from a personal contact who chose to invite him to try Kalshi's prediction market using her own device, outside of any Kalshi ecosystem.  Plaintiff's claim is intuitively ill-founded:  Kalshi did not send the message, had no influence over the alleged selection of a text message as the sender's medium of choice, did not select or suggest its recipient, and never targeted or even knew the message would be sent into Washington.  Plaintiff's claims should be dismissed for four independent reasons.

***First***, the Court lacks personal jurisdiction over Kalshi.  Kalshi neither sent nor directed any text message into Washington.  Rather, transmission of the text resulted from the unilateral choice of an independent third party, which cannot provide a basis for jurisdiction over Kalshi.

***Second***, plaintiff's CEMA claim fails because the statute does not create a private right of action to seek damages, and plaintiff cannot seek equitable relief in federal court where (as here) he has an adequate remedy at law under the CPA.  Further, plaintiff cannot allege Kalshi "initiate[d]" or "assist[ed]" in the transmission of the text message:  Kalshi sent nothing, chose no recipient, and did not know—and had no reason to know—that a third party would send a text message (as opposed to a non-text message) to an allegedly non-consenting (as opposed to a consenting) Washington resident.

***Third***, plaintiff's CPA claim is predicated entirely on the purported CEMA violation and fails for the same reason.

***Fourth***, CEMA's regulation of upstream speech—the only conduct plaintiff actually attributes to Kalshi—violates the First Amendment, both on the statute's face and as applied.

In the alternative, should the Court decline to dismiss plaintiff's claims, it should at a minimum strike the Complaint's class allegations because the Complaint demonstrates on its face that Rule 23's certification requirements cannot be satisfied.

Defendant's Motion to Dismiss & To Strike
Case No. 2:26-cv-1426

3

Quinn Emanuel Urquhart & Sullivan LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## BACKGROUND

Kalshi operates a federally-regulated prediction market exchange on which its users trade contracts tied to real-world events.  Compl. ¶¶ 15-16; Declaration of Brian Ta in Support of Kalshi's Motion to Dismiss and Motion to Strike ("Ta Decl.") ¶ 3.  As a Designated Contract Market ("DCM"), Kalshi is regulated by the U.S. Commodity Futures Trading Commission ("CFTC").  Ta Decl. ¶ 3.  Kalshi is incorporated in Delaware and has its principal place of business in New York.  *Id.* ¶¶ 4-5; Compl. ¶ 8.

Plaintiff alleges that on February 6, 2026, he "received an unsolicited text message inviting him to sign up for a Kalshi account, while a resident of Ephrata, Washington."  Compl. ¶ 41.  The alleged referral text message read, "Sign up for Kalshi with my link and we'll both get $25," followed by a Kalshi referral link, a stylized image depicting twenty-five dollars ($25), a link title of "Jennifer invited you to trade on Kalshi," and a short link to "l.facebook.com."  *Id.* ¶ 42.



*Id.*

Plaintiff does not address the presence of the "l.facebook.com" attribution, which suggests the message was actually sent via Facebook Messenger or, at a minimum, that Facebook software was involved in the transmission in some other manner.  Nor does plaintiff attempt to reconcile this unique "l.facebook.com" attribution with the "sample" text messages featured elsewhere in

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

4

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

the Complaint that lack this attribution and have different formatting. *Compare id*. (plaintiff's aforementioned alleged text message, which displays the sender's profile picture, the date and time in all caps, and a persistent "forward" arrow on the right side), *with id*. ¶ 19 (unattributed sample text message, which lacks all of these same features).

Although plaintiff alleges that upon receipt of this message, he "reasonably believed . . . that he was dealing with Kalshi," (*id*. ¶ 45), he otherwise recognizes (as he must) that the link in question is titled, "*Jennifer* invited you to trade on Kalshi," and the message from Jennifer reads, "Sign up for Kalshi with *my* link and *we'll both* get $25." *Id*. ¶ 42; *see also* Ta Decl., Ex. 6 ("*Jennifer* sent you $25 on Kalshi. . . . Trade $25 to unlock.").[1]  Plaintiff's interpretation would seemingly have Kalshi (rather than Jennifer) saying that it will somehow give *itself* $25 if he signs up.

The documents incorporated into the Complaint by reference[2] also reveal three critical steps in the referral process that are controlled entirely by third parties—not Kalshi.

***First***, contrary to plaintiff's claim that "Kalshi . . . composes a ***text message***" and "[c]licking the 'Share Link' button . . . creates a ***text message***," *id*. ¶ 19 (emphases added), in actuality, clicking that button simply prompts the mobile device's native "share" function.[3]  As the snapshots below show, the user is presented with multiple options for sharing, including via AirDrop, Messages, Notes, LinkedIn and other applications, as well as the option to save the Kalshi referral link and message without sharing it at all:

---

[1]  All emphases added unless otherwise specified.

[2]  This motion is accompanied by a separate motion to deem Exhibits #1-6 to the Ta Declaration incorporated into the Complaint by reference.

[3]  The capabilities of a device's "share" function are governed exclusively by the mobile device's native operating system as modified by the sender's habits, recently used applications, and customizations—not Kalshi. *See, e.g.*, Apple, *Customize Sharing Options in an iPhone app*, https://support.apple.com/guide/iphone/customize-sharing-options-iphc572ca489/ios  (accessed June 30, 2026) [Keller Decl., Ex. 5]; Jake Bloom, *Using Share Sheets on iOS and Android,* DEV (June 12, 2020), https://dev.to/jakebloom/using-share-sheets-on-ios-and-android-4obi [Keller Decl., Ex. 6].  This motion is accompanied by a separate request that the Court take judicial notice of the publicly-available and authoritative resources cited in this motion.

  

Ta Decl., Ex. 2 at 1-3 (Apple iOS); *see also id.,* Ex. 3 at 1 (Android) (redacted for privacy).

Kalshi neither directs nor controls which "share" functionalities are available on the sender's device or which they decide to use, if any. It is solely the sender who elects to share the Kalshi referral link and/or any referral message (in edited or unedited form) via text message specifically, as opposed to any other medium (or none at all).

***Second***, when a Kalshi user opts to start a new message via the general "Messages" or similar option on their mobile device (as opposed to one of the options, if any, specific to recently-contacted individuals), the phone's operating system opens the Messages or similar app, copies the referral link and editable message, but leaves completely blank the recipient "To:" field—for example:

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

6

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000



*Id.*, Ex. 2 at 4; *see also id.*, Ex. 3 at 2.  The sender, and the sender alone, must therefore first decide to use the Messages app in particular and then must then also decide which recipient(s) to add to the message.

*Third*, the referral flow on Kalshi's desktop website consists exclusively of a copyable referral link (*i.e.*, "Copy *link*")—without any editable referral message template:





DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

7

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

*Id.*, Ex. 4; *see* Compl. ¶ 21 (alleging "Kalshi generates a ***referral link***, and directs existing users to copy the ***referral link***," without mention of any message).

In sum, the plaintiff's allegations and the documents incorporated in his Complaint set forth the following steps for a Kalshi user to send a referral message and/or link to a contact:

(i)     the Kalshi user navigates to the "refer a friend" page in the mobile app or the "Invite friends" page on the desktop website, *see* Compl. ¶¶ 16-18 & 20;

(ii)    the Kalshi user clicks the "Share link" button on the mobile app or the "Copy link" button on the desktop website, *see id.* ¶¶ 19 & 21;

(iii)   on mobile, when a Kalshi user clicks the button, their phone is prompted to copy a referral link with an editable template message and opens the phone's native third-party "share" functionality and, on desktop, the user's click copies a referral link (without any message) to the computer's clipboard, *see id.* ¶¶ 19, 22;

(iv)    on either mobile or desktop, the Kalshi user has now exited the Kalshi app or website and then, either independently or with the assistance of third-party software (*e.g.*, Apple iOS, Google Android, or Microsoft Windows), the user pastes the Kalshi referral link and/or template message (as applicable) into the user's medium of choice, which can be but is not necessarily text messaging (*e.g.*, AirDrop, Messages, Mail, Notes, Facebook Messenger, Files, etc.), *see* Ta Decl., Exs. 2-3 (redacted for privacy);

(v)     if they so choose, the Kalshi user can edit or erase the referral message template provided on mobile, *see id.*; and

(vi)    the Kalshi user manually selects one or more recipients (or none at all) outside of the Kalshi ecosystem and sends the referral link and/or referral message if desired, *see id.*

## **LEGAL STANDARD**

On a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing that the Court's exercise of personal jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

8

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

F.3d 797, 800 (9th Cir. 2004). Although uncontroverted allegations in the complaint are taken as true, the plaintiff "cannot simply rest on the bare allegations of the complaint." *Id.* (cleaned up). Where, as here, the defendant supports its motion with a declaration controverting the complaint's jurisdictional allegations, the Court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

On a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts well-pleaded facts as true but disregards "legal conclusions couched as a factual allegation" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER KALSHI

Plaintiff cannot establish personal jurisdiction over Kalshi because the sole act tying this dispute to Washington was performed by an independent third party, not by Kalshi.[4]

The Ninth Circuit applies a three-prong minimum contacts test for specific jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum . . . ; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Schwarzenegger*, 374 F.3d at 802 (cleaned up). "The plaintiff bears the burden of satisfying the

---

[4] Plaintiff does not assert that the Court has general jurisdiction over Kalshi, nor could he—Kalshi is "at home" only in Delaware and New York (its state of incorporation and principal place of business, respectively), not Washington. *See* Compl. ¶ 8; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("[P]lace of incorporation and principal place of business" are "paradigm bases for the exercise of general jurisdiction." (cleaned up)).

first two prongs of the test.  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* (citations omitted).

Plaintiff's allegations fail at the first step: he cannot allege Kalshi directed any suit-related conduct at Washington.  *See Walden v. Fiore*, 571 U.S. 277, 284-85 (2014) ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State.").  Instead, plaintiff merely asserts that, "[d]ue to Kalshi's actions, its commercial text messages have been sent, without consent, to telephone numbers to Washington residents and harmed Washington residents." Compl. ¶ 10.  However, as shown above, Kalshi did not send the challenged message—plaintiff's friend Jennifer sent the message.  Jennifer chose whether to send the message, unilaterally chose the recipient, chose which medium to use to send the message, and executed the transmission of that message herself.  *See* Compl. ¶¶ 19-22, 42; Ta Decl., Exs. 2-3.  It is therefore Jennifer—and Jennifer alone—who possesses an alleged forum-related contact that could conceivably give rise to or be meaningfully related to plaintiff's claims.  Because it is axiomatic that the "unilateral activity of another party or a third person is not an appropriate consideration" for minimum contacts, Jennifer's relationship to the forum cannot be projected onto Kalshi. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).

To the extent plaintiff relies on a purported agency theory to impute these third-party contacts to Kalshi, the Ninth Circuit has recognized that personal jurisdiction arising from an agency relationship requires the "agent" to be "***subject to the principal's control***." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (noting a test premised merely on performance of services that would otherwise be performed by the principal would be "clearly irreconcilable" with the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).  But plaintiff does not (and cannot) allege that Kalshi at any point had the authority to control Jennifer in any relevant or potentially relevant way (it did not).

The Ninth Circuit's *en banc* decision in *Briskin v. Shopify* leaves this conclusion undisturbed.  There, plaintiff Briskin purchased a product from a nationwide online retailer that, unbeknownst to him, used defendant Shopify's nationwide payment checkout service. *Briskin v.*

*Shopify*, 135 F.4th 739, 746 (9th Cir. 2025). "*[W]hile knowing that [Briskin's] device . . . was located in California*," Shopify affirmatively reached into that device to "surreptitiously implant[] cookies that permanently remained on Briskin's device, tracked its physical location, and collected data regarding Briskin's online shopping activity." *Id*. Shopify then allegedly "used the resulting data to compile a consumer profile that [it] marketed widely, including to many California merchants." *Id*. Accordingly, the nexus between Shopify's conduct and Briskin's data privacy claims was clear—it was *Shopify's* conduct of installing trackers without consent on devices it *contemporaneously* knew were in California at the time that gave rise to Briskin's data privacy claims. Under those narrow circumstances, the Ninth Circuit held that specific personal jurisdiction over Shopify existed. *Id.* at 762.

In contrast, none of these *Briskin* factors are present here, where it is the third party, Jennifer—not Kalshi—who allegedly sent the text message in question to plaintiff and where, to the extent Kalshi ever learns of the location of a message recipient, it does so only *after* the message was already sent by one third party, received by another third party, and the latter third party clicked and/or signed up via the referral link.

## II.    PLAINTIFF FAILS TO STATE A CLAIM

If the Court concludes that it has personal jurisdiction over Kalshi, it should nevertheless dismiss the Complaint for failure to state a claim.

### A.    Plaintiff's CEMA Claim Fails For Multiple Independent Reasons

*First,* CEMA affords no freestanding private action for damages. *See Dawson v. Porch.com*, 2024 WL 4765159, at *9 (W.D. Wash. Nov. 13, 2024) ("[M]onetary relief cannot be obtained under CEMA."); *Wright v. Lyft, Inc.*, 189 Wash.2d 718, 723, 406 P.3d 1149, 1151 (2017) ("RCW § 19.190.040 does not provide an independent cause of action.").

To the extent CEMA provides a private cause of action for injunctive relief, it is unavailable here: "to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

11

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

remedy." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022).[5]  Plaintiff has an adequate legal remedy and cannot allege otherwise—he seeks damages under the CPA for the same conduct.  *See* Compl. ¶¶ 69-80; *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (a plaintiff "must establish that she lacks an adequate remedy at law" before obtaining equitable relief).

Because plaintiff can seek neither damages nor equitable relief under CEMA, the claim necessarily fails.  *See Gragg v. Orange Cab Co.*, 145 F. Supp. 3d 1046, 1052 (W.D. Wash. 2015) ("The legislature obviously knew how to create a private right of action under CEMA and chose to limit that action to injunctive relief when the wrongful conduct involved commercial . . . texts."); *see also Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1129 (9th Cir. 2020) ("The necessary prerequisite" for a court to award equitable remedies is "the absence of an adequate remedy at law.").

***Second,*** CEMA governs only "electronic commercial text messages" sent "to a telephone number assigned to a Washington resident for cellular telephone or pager service."  RCW § 19.190.060(1).  Although plaintiff alleges in conclusory fashion that the message he received was "transmitted to [his] assigned telephone number," Compl. ¶ 77, his threadbare recital is affirmatively undercut by his own image of the alleged message—which facially appears to reflect delivery via a Facebook platform ("l.facebook.com") rather than to a cellular number.  Compl. ¶ 42; *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (courts "need not accept as true" an allegation contradicted by the plaintiff's own exhibit).  Taken as a whole, the Complaint fails to sufficiently allege the message was sent via the delivery channel the statute requires.

---

[5]  Plaintiff's request for injunctive relief also independently fails for want of any concrete and immediate threat of future harm, given plaintiff alleges having received only a single unauthorized text in the past.  *See, e.g.*, *Dawson*, 2024 WL 4765159, at *9 ("1,159 texts . . . and . . . 12 texts in . . . four years . . . do not give rise to a plausible inference that the CEMA violations are on-going or that injunctive relief might be appropriate.").

Defendant's Motion to Dismiss & To Strike
Case No. 2:26-cv-1426

12

Quinn Emanuel Urquhart & Sullivan LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**Third,** section 230 of the Communications Decency Act ("CDA") "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Jensen v. Cap. One Fin. Corp.*, 2025 WL 606194, at *2 (W.D. Wash. Feb. 25, 2025). Specifically, section 230 "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009), *as amended* (Sept. 28, 2009). Per the pleadings, Kalshi is plainly a "provider or user of an interactive computer service" that plaintiff "seeks to treat, under [CEMA], as a publisher or speaker." *Id.* Accordingly, the only remaining point of possible contention is whether the "information" in question was "provided by another information content provider." *Id.*; *see also Jensen,* 2025 WL 606194, at *3 ("Jensen does not dispute that the first and [second] requirements are satisfied; she only disputes the [third]."). Plaintiff is silent as to whether Jennifer edited the message she allegedly took from Kalshi, asserting only that "[t]he text message ***contained*** text that was composed by Kalshi," Compl. ¶ 45, without addressing whether it ***also*** contained text written (or removed) by Jennifer. However, to the extent that Jennifer did edit the message, Kalshi cannot be assigned liability under section 230.

**Fourth,** even if plaintiff could overcome those threshold hurdles (he cannot), he fails to plausibly allege that Kalshi "initiated" or "assisted" the transmission of the unauthorized message:

<u>No Initiation.</u> CEMA defines the phrase "initiate the transmission" as "***the action by the original sender*** of . . . an electronic text message." RCW § 19.190.010(7). However, by plaintiff's own account, Kalshi is not the "original sender." Instead, it is a Kalshi user, Jennifer, who copied her referral link and a referral message and transmitted those through her chosen application to the recipient she selected (*i.e.*, plaintiff). *See* Compl. ¶¶ 19-22, 42. On those allegations, the only person who could have "initiated" the message within the meaning of the statute is Jennifer—not Kalshi.

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

Because Kalshi did not send the message, the only way for plaintiff to attribute "initiation" to Kalshi is to impute Jennifer's act to it through an agency theory—the same theory plaintiff unsuccessfully relies on in the jurisdictional context. *See* Section I, *supra*. But plaintiff's agency theories fail here for the same reasons.

Actual agency is absent because it requires that the purported agent act on the principal's behalf and "subject to the principal's control." *Williams*, 851 F.3d at 1024 ; *see Moss v. Vadman*, 77 Wash. 2d 396, 402-03, 463 P.2d 159, 164 (1969) ("[A]n agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control."). Plaintiff does not allege Kalshi had any right to control whether, when, how, or to whom any user—including Jennifer—sends messages.

Apparent authority is similarly lacking—it requires that plaintiff have "actually, or subjectively, believe[d] that [Jennifer] ha[d] authority to act for [Kalshi]," where such "actual, subjective belief is objectively reasonable." *King v. Riveland*, 125 Wash.2d 500, 507, 886 P.2d 160 (1994). It is manifestly unreasonable for plaintiff to have believed that the message he received was sent "on Kalshi's behalf" when—by plaintiff's own admission—it was sent by his personal contact, Jennifer, and contained several explicit indicia that Jennifer was sending it on her own behalf—*i.e.*, "***Jennifer*** invited you," "Sign up for Kalshi with ***my*** link and ***we'll both*** get $25," Compl. ¶ 42, "***Jennifer*** sent you $25 on Kalshi." Ta Decl., Ex. 6. The alleged facts simply do not support apparent agency or agency of any sort.[6] *Cf. Sundstrom v. Ocean Reef Media LLC*, 2026 WL 1361646, at *4 (W.D. Wash. May 15, 2026) ("Apparent authority cannot be established

---

[6] Notwithstanding plaintiff's apparent suggestion to the contrary, *see* Compl. ¶ 29 ("Kalshi also ratifies the initiation"), the concept of "ratification" does not provide a standalone basis upon which Jennifer's acts could be imputed to Kalshi, as ratification comes into play only where "the actor acted or purported to act as an agent on the person's behalf." Restatement (Third) of Agency § 4.03. Because, as already demonstrated, Jennifer possessed neither actual nor apparent authority under the facts alleged, any supposed "ratification" is immaterial. *See id.* § 4.03 cmt. b. ("When an actor is not an agent and does not purport to be one, . . . ratification is not a basis on which another person may become subject to the legal consequences of the actor's conduct.").

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

14

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

merely by showing that the agent claimed authority or purported to exercise it, but must be established by proof of **something said or done by the principal** on which the third party reasonably relied. . . . [M]ere use of franchisor logos, signage, and marketing material by a franchisee is not sufficient manifestation by the franchisor to establish apparent authority." (cleaned up)).

*No Assistance.*    Plaintiff's fallback—that Kalshi "assisted" the transmission—fares no better.  CEMA does not impose liability on everyone who makes a message possible.  Instead, it defines "assist the transmission" in relevant part as follows:

> "Assist the transmission" means actions taken by a person to provide **substantial assistance or support which enables** any person to formulate, compose, send, originate, initiate, or transmit . . . a commercial electronic text message when the person providing the assistance **knows or consciously avoids knowing that the initiator** of . . . the commercial electronic text message **is engaged, or intends to engage, in any practice that violates the [CPA].**

RCW § 19.190.010(1).  In other words, as applied here, CEMA "assistance" requires both (i) substantial assistance or support, *see also* Section III.A., *infra*, and (ii) knowledge, or conscious avoidance of knowledge, that the initiator is engaged, or intends to engage, in the transmission of an unsolicited commercial electronic text message to a Washington cellular telephone number (*i.e.*, a violation of CEMA).

At bottom, plaintiff alleges, at most, that Kalshi provides its users with a copyable referral link and (on its mobile app only) an editable referral message.  Plaintiff's allegations do not establish that Kalshi at any point knew or deliberately avoided knowing that a user had decided to employ text messaging (or any other particular medium) to send a text message to a Washington cell phone number specifically, much less that Kalshi possessed such knowledge or conscious avoidance before or contemporaneously with the message transmission.  *See* BACKGROUND, *supra*.  Therefore, Kalshi's alleged conduct does not rise to the level of "substantial assistance" provided with the requisite scienter.

Indeed, this deficiency becomes especially evident when plaintiff's allegations are compared to those in other CEMA "refer a friend" cases in this District that have survived motions to dismiss:

- In *Wright v. Lyft, Inc.*, the "process involves a Lyft user opening the application, clicking on the 'Settings' menu, selecting 'Invite Friends,' then selecting one or multiple individuals from the user's contacts or 'Select All,' and, finally, agreeing to 'Send Invites.'" 189 Wash. 2d 718, 721 (2017). This "enable[s] the Lyft app to access non-user data on their cell phones," 2016 WL 7971290, at *1 (W.D. Wash. Apr. 15, 2016), and to "automatically transmit programmatically generated text message advertisements," Second Amended Complaint (ECF No. 62) at ¶ 16, *Wright v. Lyft, Inc.,* No. 2:14-cv-00421-BJR (W.D. Wash. Apr. 4, 2016) [Keller Decl., Ex. 1].[7] At no point is Kalshi alleged to have accessed its users' contacts, composed text messages specifically (as opposed to messages that could be sent using various available forms for transmission), or provided its users with tools to facilitate the sending of multiple text messages at once—nor did it.

- In *Moore v. Robinhood Fin. LLC*, Robinhood provided its users with two referral options, both of which purposefully facilitated the sending of text messages to multiple recipients at once. *See* First Amended Complaint (ECF No. 54) at ¶¶ 31-32, No. 2:21-cv-01571-BJR (W.D. Wash. Feb. 9, 2022) [Keller Decl., Ex. 2]. Specifically, "If a Robinhood user selects 'Invite Contacts,' then the Robinhood App accesses the user's address book, displays the user's contacts in the Robinhood App, and sometimes recommends particular recipients. Using the 'Share Link' method skips the step of the Robinhood App displaying these recommendations

---

[7]   As used throughout, this notation denotes that the document in question is appended as an exhibit to the Declaration of Nicolas G. Keller in Support of Kalshi's Motion to Dismiss and Motion to Strike ("Keller Decl.") and is subject to Kalshi's separately filed request for judicial notice.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

16

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

and instead directs the user to the native address book on the user's phone." *Id*. at ¶ 31 n.10; *see also Moore v. Robinhood Fin. LLC*, 2022 WL 3082969, at *1 (W.D. Wash. Aug. 3, 2022). Kalshi is not alleged to have accessed, displayed, or recommended contacts—rather, any recipient selection happens wholly outside any Kalshi interface.

- Similarly, in *Bottoms v. Block, Inc.*, Cash App "accesses the user's phone contacts," and "[a]s soon as the referring user clicks the 'Get $5' button . . . , ***the Cash App Mobile App generates a text message directed to the contact***." Class Action Complaint (ECF No. 1-2) at ¶¶ 27 & 29, No. 2:23-cv-01969-MJP (W.D. Wash. Dec. 21, 2023) [Keller Decl., Ex. 3]. In contrast, Kalshi is not alleged to have accessed user contacts or created such "***pre-addressed***" messages, much less within the Kalshi app itself. *Id*. ¶ 30; *see also Bottoms v. Block, Inc.*, 2024 WL 1931690, at *2 (W.D. Wash. May 2, 2024).

- In *Jensen v. Capital One Financial Corporation*, Capital One's mobile referral process explicitly envisioned that users would send text messages specifically, as the app displayed the disclaimer to its users that, "You confirm you have consent to send ***text messages*** to each recipient," 2025 WL 606194, at *1 (W.D. Wash. Feb. 25, 2025)—thereby evincing direct knowledge as to the text message medium users were expected to employ. In contrast, Kalshi does not pre-compose any ***text*** messages; instead, and on mobile only, it is alleged to have pre-composed ***a*** message, without directing or anticipating the use of any particular medium.

- In *Charles v. Chime Fin., Inc.*, Chime "accesses the user's phone contacts and allows the user to select individuals," and "gamif[ies] the referral process, further incentivizing its users to spam their contacts." Class Action Complaint (ECF No. 18) at ¶¶ 20 & 23, No. 2:25-cv-01361-KKE (W.D. Wash. Sept. 5, 2025) [Keller Decl., Ex. 4]; *see also White v. Chime Fin. Inc.*, 2026 WL 1506075, at *1 (W.D.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

17

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

Wash. May 29, 2026).  Once again, Kalshi is not alleged to access contacts, and no volume-scaled "spam your contacts" incentive of that kind is pleaded either.

In sum, unlike in these other cases, at no point is Kalshi alleged to have accessed or mined users' contacts, to have used any such information to mass spam those contacts, or to have otherwise facilitated mass spamming—the very conduct at the heart of CEMA's prohibitions.  *See* RCW § 19.190.060 ("Intent—2003 c 137 . . . The legislature recognizes that the number of unsolicited commercial text messages sent to cellular telephones and pagers is increasing. . . . These unsolicited messages often result in costs to the cellular telephone and pager subscribers in that they pay for use when a message is received . . . .").

Providing a copyable referral link and (on mobile only) an editable, medium-agnostic message as Kalshi is alleged to have done is not the knowing "substantial assistance" that CEMA proscribes.  *See* RCW § 19.190.010(1).

**B.    Plaintiff's Derivative CPA Claim Fails For The Same Reasons**

Plaintiff's CPA claim is entirely predicated on the alleged CEMA violation.  *See* Compl. ¶ 79 ("Violations of the CEMA are . . . an 'unfair or deceptive act in trade or commerce and an unfair method of competition' for the purpose of applying the CPA.").  The CPA claim therefore fails for the same fundamental reason—Kalshi neither "initiated" nor "assisted" the transmission of an unsolicited electronic commercial text message.  *See Wick v. Twilio Inc.*, 2017 WL 2964855, at *6 (W.D. Wash. July 12, 2017) ("[P]laintiff has failed to adequately allege a CEMA violation and may not, therefore, pursue a derivative CPA claim.").

**III.    CEMA RUNS AFOUL OF THE CONSTITUTION**

Kalshi thus did not send, direct, or compose any commercial electronic text message.  *See* Sections I-II, *supra*.  But should the Court accept plaintiff's premise that the referral template is Kalshi's own commercial speech and that CEMA reaches its creation, that construction renders the statute facially unconstitutional as a regulation of the upstream creation of non-misleading commercial expression.  In the alternative and at a minimum, CEMA is unconstitutional as applied to Kalshi here.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

18

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

**A.     CEMA's Prohibition On Upstream Speech Is Facially Unconstitutional**

The First Amendment does not permit the government to impose liability on lawful, non-misleading commercial expression created before and divorced from any transmission. Yet CEMA does exactly that, impermissibly reaching the act of expressive composition itself in every application.

> 1.     CEMA Facially Reaches Protected Upstream Composition

CEMA prohibits substantial assistance that "enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic text message." RCW §§ 19.190.010(1) & 19.190.060(1). Whichever verb from that list is invoked, liability premised on the creation of expressive written content before any message exists or any recipient is chosen imposes liability on writing itself. CEMA's prohibitions would reach an advertising agency drafting referral copy, a marketing consultant crafting a message template, a copywriter developing promotional language, and a technology company composing a pre-populated referral prompt for its users. Such "writing" is "*pure* speech," and courts "have never seriously questioned that the processes of writing words down [is a] purely expressive activit[y] entitled to full First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (emphasis in original); *see also Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (Supreme Court has "expressly applied First Amendment protections to speech-creation processes"); *Bledsoe v. Ferry Cnty.*, 499 F. Supp. 3d 856, 871 (E.D. Wash. 2020) (writing "invokes [First Amendment] principles in nearly their purest form" (cleaned up)).

> 2.     Liability For Upstream Speech Fails *Central Hudson* In All Applications

Under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, to overcome First Amendment protection over commercial speech, "[t]he State must assert a substantial interest to be achieved;" "the restriction must directly advance the state interest involved;" and "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 U.S. 557, 564 (1980). CEMA's liability for upstream speech fails each prong in every application.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

19

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

(a)    *No Governmental Interest Attaches Upstream*

The State of Washington has no constitutional basis for suppressing non-misleading commercial speech unrelated to unlawful activity before any message has been sent, where any asserted regulatory interest does not yet exist and may never materialize. CEMA's intention "to limit the practice of **sending** unsolicited commercial text messages to cellular telephone or pager numbers in Washington," RCW § 19.190.060 ("Intent—2003 c 137"), carries no governmental interest at the composition stage—where no recipient exists, no message has been sent, and no intrusion has occurred or is certain to occur. The government carries the burden on this point, which cannot be "satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). Prohibiting pre-transmission speech because it **might** result in transmission is speculation of this exact sort.

(b)    *The Restriction Does Not Advance Any Interest*

The harm CEMA theoretically targets "does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent" independent choices by third parties— whether any user chooses to send a composed template, to whom, and without consent. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250 (2002). The Supreme Court has repeatedly invalidated precisely this kind of upstream speech restriction: "[W]e have never held that the government itself can shut off the flow of mailings to protect those recipients who might potentially be offended" as "the short, though regular, journey from mail box to trash can is an acceptable burden, as least so far as the Constitution is concerned." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) (cleaned up & collecting cases); *see, e.g.*, *Linmark Assocs. v. Willingboro*, 431 U.S. 85, 94 (1977) (striking down an ordinance targeting speech based on its "'primary' effect—that they will cause those receiving the information to act upon it"). A restriction that burdens composition to prevent speculative, mediated harm provides only "ineffective or remote support for the government's purpose" under *Central Hudson*. 447 U.S. at 564.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

20

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

(c)    *Less Restrictive Alternatives Are Always Available*

"If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). The obvious alternative here is to regulate the sender—the party who selected the recipient, controls transmission, and could have verified consent before pressing send—as CEMA's "initiation" liability already does. *See W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095-96 (9th Cir. 2001). "In the absence of a showing that more limited speech regulation would be ineffective," a court "cannot approve the complete suppression" of protected commercial expression. *Central Hudson*, 447 U.S. at 571.

### 3.    The Proper Remedy Is Severance Of Liability For Upstream Speech

Where, as here, "a substantial number of" CEMA's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Moody v. NetChoice*, 603 U.S. 707 (2024) (cleaned up), the appropriate remedy is to excise liability for upstream speech. *See NetChoice, LLC v. Bonta*, 170 F.4th 744, 767-70 (9th Cir. 2026); *Matsumoto v. Labrador*, 122 F.4th 787, 815 (9th Cir. 2024). CEMA's existing liability for sending, initiating, and transmitting messages—together with the statute's transmission-focused carve-outs—preserve its function against those who actually deliver unwanted messages, while eliminating its unconstitutional upstream overreach.

Severance would eliminate plaintiff's claims here. Plaintiff does not allege that Kalshi itself sent, initiated, or transmitted any text message to any Washington resident—only that Kalshi's users did. *See* Compl. ¶¶ 25-30. Kalshi's alleged liability rests entirely on its role in creating the message users later chose unilaterally to send: generating the referral link, composing the text, and creating the accompanying image. Compl. ¶¶ 19, 30, 45. With liability for that upstream speech severed, no remaining CEMA provision reaches Kalshi on the allegations pleaded.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

21

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

**B.      In The Alternative, CEMA Cannot Constitutionally Be Applied To Kalshi's Composition Of An Editable Referral Template**

CEMA is also plainly unconstitutional as applied to plaintiff's allegations against Kalshi. Plaintiff alleges that Kalshi composes the messages users subsequently send.  Compl. ¶¶ 19, 25-30, & 45.  By plaintiff's own account, the conduct giving rise to alleged liability is Kalshi's upstream, pre-transmission creation of the referral message itself.  That is protected expression, the prohibition of which fails *Central Hudson*.  *See* Section III.A., *supra*.

Washington has no legitimate interest in prohibiting Kalshi's upstream speech, just as it has no interest in banning the creation of books, news articles, or advertisements.  The only relationship between Kalshi's editable draft message and any unwanted text message depended entirely on a third-party user's subsequent choices—whether to edit it, which recipient to choose, whether to obtain the recipient's consent, and whether to press "send."  *See id.* ¶¶ 19 & 22; Sections I-II, *supra*.  The obvious alternative to this impermissible governmental intrusion is a step the legislature has already taken—regulating the sender through "initiation" liability without reaching those engaged in pure First Amendment activity, like Kalshi.

**IV.     THE CLASS ALLEGATIONS SHOULD BE STRICKEN**

The class definition pleaded in the Complaint could never satisfy Rule 23's ascertainability requirement because it constitutes an impermissible "fail-safe" class and because determining membership therein would invariably necessitate individualized inquiries.  The Court should therefore strike the Complaint's class allegations under Rule 12(f).  *See* Fed. R. Civ. P. 23(d)(1)(D) ("[T]he court may issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly.").

Plaintiff pleads an "impermissible fail-safe class"—that is, a class "defined to include only those individuals who were injured by the allegedly unlawful conduct." *Mansor v. United States Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 207 (W.D. Wash. 2023) (in part quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022)); *see also Angulo v. Providence Health & Servs. - Washington*, 2024 WL 3744258, at *8 (W.D.

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

22

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

Wash. Aug. 9, 2024), *decision clarified on reconsideration*, 2024 WL 4121881 (W.D. Wash. Sept. 9, 2024) (The Ninth Circuit in "*Olean* expressly admonishes courts that they must not create fail safe classes.").

Specifically, the Complaint defines the class as "all persons who, within the applicable statute of limitations period and ***without having given advance clear and affirmative consent***, received a Kalshi 'Refer a friend' text message to their cellular telephone number while residing in Washington." Compl. ¶ 48. This class definition subsumes a critical element of a CEMA violation—the absence of consent. *See* RCW § 19.190.070(1)(b) (no violation if the recipient has "affirmatively consented in advance"). Accordingly, this "class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Mansor*, 345 F.R.D. at 207 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)); *Cashatt v. Ford Motor Co.*, 2021 WL 1140227, at *3 (W.D. Wash. Mar. 24, 2021) ("[B]ecause injury and causation are elements that must be established and which go to the question of liability"—just like the absence of consent is here—"they are therefore not appropriate as part of the definition of the class.").

Additionally, consent under RCW § 19.190.070(1)(b), as applied to the Complaint's allegations, turns on the relationship and course of dealing between each third-party text-message sender (*i.e.*, the Kalshi user) and each third-party recipient (*i.e.*, the user's contact of choice). If a user texted or verbally asked a friend if they would like to receive a Kalshi referral link before the user sent it, and the friend agreed, there is no potential violation by Kalshi. Similarly, there is no CEMA violation even if the friend did not consent where Kalshi neither knew nor consciously avoided knowing as much. These determinations necessitate a recipient-by-recipient examination into the circumstances specific to each of these third-party interactions—which defeats class certification. *See Cashatt*, 2021 WL 1140227, at *2 ("[C]ourts have struck class allegations at the pleading stage where an element to the plaintiff's claims inherently involves individualized inquiries.").

Defendant's Motion to Dismiss & To Strike
Case No. 2:26-cv-1426

23

Quinn Emanuel Urquhart & Sullivan LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Consequently, under plaintiff's proposed class definition, to ascertain class membership, the Court would not only first have to resolve the key merits issue of consent, it would also have to do so on an individualized basis as to each purported class member and each purported text message. That is not permissible, and the Court should strike plaintiff's class allegations.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint for lack of personal jurisdiction, for failure to state a claim, on First Amendment grounds, and—in the alternative— should strike the Complaint's class allegations.

Pursuant to section V(G) of the Court's Standing Order (ECF Nos. 5 & 5-1), Kalshi conferred with plaintiff on July 13, 2026 regarding the relief sought by this motion. The parties did not resolve the issues that would have avoided the need for this motion.

Dated: July 17, 2026

By: */s/ Matthew Hosen*
Matthew Hosen
matthosen@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Tel: (206) 905-7000
Fax: (206) 905-7100

Avi Perry*
aviperry@quinnemanuel.com
Rachel Frank Quinton*
rachelquinton@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8000
Fax: (202) 538-8100
(*Admitted *Pro Hac Vice*)

John W. Baumann*
jackbaumann@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426
24
QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Tel: (213) 443-3000
Fax: (213) 443-3100
(*Admitted *Pro Hac Vice*)

Nicolas G. Keller*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

DEFENDANT'S MOTION TO DISMISS & TO STRIKE
CASE NO. 2:26-CV-1426

25

QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7(e)(4), I certify that this memorandum contains 6,888 words and therefore does not exceed 8,400 words.

Dated:  July 17, 2026                              By: */s/ Matthew Hosen*
                                                   Matthew Hosen