**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

NICHOLAS BROWN, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

KALSHI INC.,

*Defendant.*

Case No. 2:26-cv-1426-LK

**DEFENDANT KALSHI INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, TO STRIKE CLASS ALLEGATIONS**

Hon. Lauren King

NOTE ON MOTION CALENDAR:
December 11, 2026

**Oral Argument Requested**



QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

# TABLE OF CONTENTS


**Page**

NOTICE OF MOTION ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........ 3

BACKGROUND ........ 4

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. THE COURT LACKS PERSONAL JURISDICTION OVER KALSHI ........ 9

II. PLAINTIFF FAILS TO STATE A CLAIM ........ 11

- A. CEMA Does Not Apply ........ 12
- B. In Any Event, CEMA's Substantive Elements Are Insufficiently Pled ........ 16
- C. Plaintiff's CPA Claim Also Fails ........ 22

III. CEMA CANNOT CONSTITUTIONALLY BE APPLIED TO KALSHI'S REFERRAL EXPRESSION ........ 23

- A. Kalshi's Referral Expression Is Protected Commercial Speech ........ 23
- B. CEMA's Application To Kalshi's Upstream Expression Fails *Central Hudson* ........ 25
  - 1. Restricting Kalshi's Upstream Expression Does Not Directly Advance CEMA's Regulatory Interests ........ 25
  - 2. Less Restrictive Alternatives Are Available ........ 26

IV. THE CLASS ALLEGATIONS SHOULD BE STRICKEN ........ 27

CONCLUSION ........ 28

## NOTICE OF MOTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 11, 2026, or at the next date and time that is available for the Court, defendant Kalshi Inc. ("Kalshi") will move this Court to dismiss the First Amended Class Action Complaint ("FAC") (ECF No. 28) for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), for failure to state a claim under Rule 12(b)(6), and on First Amendment grounds as well as, in the alternative, to strike the FAC's class allegations. Kalshi so moves based on the following Memorandum of Points and Authorities, the argument of counsel, and any additional materials as may be submitted to and accepted by the Court before its decision.

Dated: October 2, 2026

By: */s/ Matthew Hosen*
Matthew Hosen
matthosen@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Tel: (206) 905-7000
Fax: (206) 905-7100

Avi Perry*
aviperry@quinnemanuel.com
Rachel Frank Quinton*
rachelquinton@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8000
Fax: (202) 538-8100
(*Admitted *Pro Hac Vice*)

John W. Baumann*
jackbaumann@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP

865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Tel: (213) 443-3000
Fax: (213) 443-3100
(*Admitted *Pro Hac Vice*)

Nicolas G. Keller*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff's original complaint alleged that Kalshi violated Washington's Commercial Electronic Mail Act ("CEMA") by causing an unconsented commercial ***text message*** to be sent to his cellular telephone. That theory collapsed on the face of plaintiff's own pleading, which depicted the message in question as having been sent through Facebook's Messenger platform, l.facebook.com—a fact which plaintiff now concedes.

Having admitted the message he received was not a text message under the statute, plaintiff attempts to retreat to CEMA's last refuge: that the Facebook Messenger message was, somehow, an "electronic mail message"—that is, an ***email***—with "false or misleading information in the subject line" under RCW 19.190.020. To supply the missing element of falsity, the FAC bolts on a sprawling new narrative that Kalshi—a federally regulated Designated Contract Market—is supposedly operating an unregulated "gambling" enterprise, thereby transforming the word "trade" in the message "Jennifer invited you to trade with Kalshi" into a false or misleading statement. Plaintiff's novel theory adds yet another fatal defect to the FAC, which fails at every step.

***First***, the Court continues to lack personal jurisdiction. Kalshi sent nothing into Washington, chose no recipient, and made no use of Facebook Messenger. Instead, the lone act connecting this dispute to Washington was performed by an independent third party, plaintiff's Facebook friend "Jennifer," and the FAC's new allegations that Kalshi offers markets on Washington sporting and political events do not supply the required nexus between Kalshi's forum conduct and the referral message that gives rise to plaintiff's claims.

***Second***, plaintiff's Facebook-Messenger-based theory dooms his CEMA claim, as CEMA's definition of "electronic mail message" by its plain terms—and as interpreted by every court to have applied RCW 19.190.020—refers to emails and categorically does not extend to Facebook Messenger messages. In any event, plaintiff fails to sufficiently plead that any "subject line" of the Facebook Messenger message was false or misleading under CEMA.

***Third***, the CPA claim fails, too. Plaintiff's derivative CPA theory falls with his CEMA claim, and, to the extent he asserts a freestanding "illegal gambling" theory of CPA unfairness, such a theory independently fails because the challenged statement is not deceptive and, in any event, the FAC pleads no injury to business or property, as required under the statute.

***Fourth***, applying CEMA's prohibition on the upstream composition of a referral template to Kalshi violates the First Amendment.

In the alternative, the Court should strike the class allegations, which on their face cannot satisfy Rule 23.

## BACKGROUND

Kalshi operates a federally-regulated prediction market exchange on which users trade contracts tied to real-world events. *See* FAC ¶¶ 5, 31; ECF No. 20, First Declaration of Brian Ta in Support of Kalshi's Motion to Dismiss ("Ta Decl.") ¶ 3; *see also* FAC ¶ 31 ("Using a ***financial exchange license***,"[1] Kalshi is "opening up sports markets—and everything else—for all Americans."). As a Designated Contract Market ("DCM"), Kalshi is regulated by the U.S. Commodity Futures Trading Commission ("CFTC"). *See* Ta Decl. ¶ 3. Kalshi is incorporated in Delaware and has its principal place of business in New York. *See id.* ¶¶ 4–5; FAC ¶ 10.

Plaintiff alleges that on February 6, 2026, he "received an unsolicited 'Refer a friend' Facebook Messenger message inviting him to sign up for a Kalshi account, while a resident of Ephrata, Washington." FAC ¶ 75. The alleged referral message read, "Sign up for Kalshi with my link and we'll both get $25," followed by a Kalshi referral link, a stylized image depicting twenty-five dollars ($25), a link description of "Jennifer invited you to trade on Kalshi," and a short link to "l.facebook.com." *Id.* ¶ 76.

[1] All emphases added unless otherwise specified.


QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000




*Id.*

Although plaintiff alleges that upon receipt of this message, he "reasonably believed … that he was dealing with Kalshi," *id.* ¶ 80, he otherwise recognizes (as he must) that the link in question is titled, "***Jennifer*** invited you to trade on Kalshi," and the message from Jennifer reads, "Sign up for Kalshi with ***my*** link and ***we'll both*** get $25." *Id.* ¶ 76; *see also* Ta Decl., Ex. 6 ("***Jennifer*** sent you $25 on Kalshi. … Trade $25 to unlock."). Plaintiff's interpretation would seemingly have Kalshi (rather than Jennifer) saying that it will somehow give ***itself*** $25 if he signs up.

The documents incorporated into the FAC by reference[2] also reveal three critical steps in the referral process that are controlled entirely by third parties—not Kalshi.

***First***, contrary to plaintiff's claim that "Kalshi … composes a ***message***" and "[c]licking the 'Share link' button … creates a ***message***," *id.* ¶ 25, in actuality, clicking that button simply prompts the mobile device's native "share" function.[3] As the snapshots below show, the user is

---

[2] This motion is accompanied by a separate motion to deem Exhibits #1-6 to the First Ta Declaration and Exhibits #1-3 to the Second Ta Declaration incorporated into the FAC by reference. *See also* ECF No. 22.

[3] The capabilities of a device's "share" function are governed exclusively by the mobile device's native operating system as modified by the sender's habits, recently used applications, and customizations—not Kalshi. *See, e.g.*, Apple, *Customize sharing options in an iPhone app*, https://support.apple.com/guide/iphone/customize-sharing-options-iphc572ca489/ios (accessed June 30, 2026) [Keller Decl., Ex. 5]; Jake Bloom, *Using Share Sheets on iOS and Android,* DEV (June 12, 2020), https://dev.to/jakebloom/using-share-sheets-on-ios-and-android-4obi [Keller

presented with multiple options for sharing, including via AirDrop, Messages, Notes, LinkedIn and other applications, as well as the option to save the Kalshi referral link and message without sharing it at all:




Ta Decl., Ex. 2 at 1–3 (Apple iOS); *see also id.,* Ex. 3 at 1 (Android) (redacted for privacy).

Kalshi neither directs nor controls which "share" functionalities are available on the sender's device or which they decide to use, if any. It is solely the sender (here, Jennifer) who elects to share the Kalshi referral link and/or any referral message (in edited or unedited form) via Facebook Messenger, as opposed to any other medium (or none at all).

***Second***, when a Kalshi user opts to start a new message via the "Facebook" option on their mobile device (as opposed to one of the options, if any, specific to recently-contacted individuals),

---

Decl., Ex. 6]. This motion is accompanied by a separate request that the Court take judicial notice of the publicly-available and authoritative resources cited in this motion.

the phone's operating system copies the referral link and editable message, opens the Facebook Messenger app, but leaves the recipient field blank and unselected—for example:




Second Declaration of Brian Ta in Support of Kalshi's Motion to Dismiss ("Second Ta Decl."), Ex. 1 at 3 (annotation omitted); *see also id.*, Ex. 2 at 2. The sender, and the sender alone, must therefore decide to use the Facebook Messenger app in particular and then must also decide which recipient(s) to send the message to.

***Third***, the referral flow on Kalshi's desktop website consists exclusively of a copyable referral link (*i.e.*, "Copy ***link***")—without any editable referral message template:



Ta Decl., Ex. 4; *see* FAC ¶¶ 27–28 (alleging "Kalshi generates a ***referral link***, and directs existing users to copy the ***referral link***," without mention of any message).

In sum, the plaintiff's allegations and the documents incorporated in his FAC set forth the following steps for a Kalshi user to send a referral message and/or link to a contact:

(i) the Kalshi user navigates to the "Refer a friend" page in the mobile app or the "Invite friends" page on the desktop website, *see* FAC ¶¶ 22–27;

(ii) the Kalshi user clicks the "Share link" button on the mobile app or the "Copy link" button on the desktop website, *see id.* ¶¶ 25–27;

(iii) on mobile, when a Kalshi user clicks the button, their phone is prompted to copy a referral link with an editable template message and opens the phone's native third-party "share" functionality and, on desktop, the user clicks to copy a referral link (without any message) to the computer's clipboard, *see id.* ¶¶ 25, 27–28;

(iv) on either mobile or desktop, the Kalshi user has now exited the Kalshi app or website and then, either independently or with the assistance of third-party software (*e.g.*, Apple iOS, Google Android, or Microsoft Windows), the user pastes the Kalshi referral link and/or template message (as applicable) into the user's medium of choice (*e.g.*, Facebook Messenger, AirDrop, Messages, Mail, Notes, Files, etc.), *see* Ta Decl., Exs. 2–3 (redacted for privacy);

(v) if they so choose, the Kalshi user can edit or erase the referral message template provided on mobile, *see id.*; and

(vi) the Kalshi user manually selects one or more recipients (or none at all) outside of the Kalshi ecosystem and sends the referral link and/or referral message if desired, *see id.*

## LEGAL STANDARD

On a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing that the Court's exercise of personal jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Although uncontroverted allegations in the complaint are taken as

true, the plaintiff "cannot simply rest on the bare allegations of [the] complaint." *Id.* (cleaned up). Where, as here, the defendant supports its motion with a declaration controverting the complaint's jurisdictional allegations, the Court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

On a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts well-pleaded facts as true but disregards "legal conclusions couched as a factual allegation" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Rule 23, the Court may "require that the pleadings be amended to eliminate allegations about representation of absent persons" where the pleadings themselves establish that no class could be certified. Fed. R. Civ. P. 23(d)(1)(D).

## ARGUMENT

### I. THE COURT LACKS PERSONAL JURISDICTION OVER KALSHI

Plaintiff cannot establish personal jurisdiction over Kalshi because the sole act tying this dispute to Washington was performed by an independent third party, not by Kalshi.[4]

The Ninth Circuit applies a three-prong minimum contacts test for specific jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum … ; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of

[4] Plaintiff does not assert that the Court has general jurisdiction over Kalshi, nor could he—Kalshi is "at home" only in Delaware and New York (its state of incorporation and principal place of business, respectively), not Washington. *See* FAC ¶ 10; Ta Decl. ¶ 6; *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("[P]lace of incorporation and principal place of business" are "paradigm bases for the exercise of general jurisdiction." (cleaned up)).

jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Schwarzenegger*, 374 F.3d at 802 (cleaned up).

Plaintiff's allegations fail at the first step: he cannot allege Kalshi directed any suit-related conduct at Washington. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State."). Kalshi did not send the challenged message—Jennifer did, and, in doing so, she unilaterally chose whether to send the message, chose the recipient, chose which medium to use to send the message, and executed that transmission. *See* FAC ¶¶ 25–28, 75–76; Ta Decl., Exs. 2–3. It is therefore ***Jennifer***, not Kalshi, who possesses an alleged forum-related contact that could conceivably give rise to or be meaningfully related to plaintiff's claims.

The FAC's new allegations that Kalshi offers markets on "Washington sporting events and Washington political races," *see* FAC ¶¶ 13–14, 33, do nothing to change this. Plaintiff does not allege that Kalshi offering event contracts to Washington residents caused Jennifer to send a Facebook Messenger message to plaintiff. Nor do those event contracts have any meaningful nexus to the conduct underlying plaintiff's complaint (*i.e.*, Jennifer's transmission of a Facebook Messenger message). *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. 351, 362 (2021) (plaintiff's claims must "arise out of or relate to the defendant's contacts" with the forum); *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 264 (2017) (where there is no "affiliation between the forum and the underlying controversy," "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State" (cleaned up)). And because the "unilateral activity of another party or a third person is not an appropriate consideration" for minimum contacts, Jennifer's relationship to the forum cannot be projected onto Kalshi. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).

The FAC's new agency labels do not change the analysis either. *See* FAC ¶¶ 47–50 (asserting actual agency, apparent agency, and ratification theories). Personal jurisdiction arising from an agency relationship requires the "agent" to be "***subject to the principal's control***." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (noting a test premised

merely on performance of services that would otherwise be performed by the principal would be "clearly irreconcilable" with the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). But plaintiff does not (and cannot) allege that Kalshi at any point had the authority to control Jennifer in any relevant way (it did not). Furnishing a copyable link and an editable template for Jennifer's potential use as she sees fit is not "control."

The Ninth Circuit's *en banc* decision in *Briskin v. Shopify* leaves this conclusion undisturbed. There, plaintiff Briskin purchased a product from a nationwide online retailer that, unbeknownst to him, used defendant Shopify's nationwide payment checkout service. 135 F.4th 739, 746 (9th Cir. 2025). "***[W]hile knowing that [Briskin's] device … was located in California***," Shopify affirmatively reached into that device to "surreptitiously implant[] cookies that permanently remained on Briskin's device, tracked its physical location, and collected data regarding Briskin's online shopping activity." *Id*. Shopify then allegedly "used the resulting data to compile a consumer profile that [it] marketed widely, including to many California merchants." *Id*. Accordingly, the nexus between Shopify's conduct and Briskin's data privacy claims was clear—it was ***Shopify's*** conduct of installing trackers without consent on devices it ***contemporaneously*** knew were in California at the time that gave rise to Briskin's data privacy claims. Under those narrow circumstances, the Ninth Circuit held that specific personal jurisdiction over Shopify existed. *Id.* at 762.

By contrast, none of these *Briskin* factors are present here, where it is the third party, Jennifer—not Kalshi—who sent the Facebook Messenger message in question to plaintiff and where, to the extent Kalshi ever learns of the location of a message recipient, it does so only ***after*** the message was already sent by one third party, received by another third party, and the latter third party "click[ed] the link and fill[ed] out the form," FAC ¶ 49; *see* Ta Decl. ¶ 16.

## II. PLAINTIFF FAILS TO STATE A CLAIM

If the Court concludes that it has personal jurisdiction over Kalshi, it should nevertheless dismiss the FAC for failure to state a claim.

### A. CEMA Does Not Apply

Plaintiff's CEMA claim suffers from several independently fatal threshold defects.

***First,*** because CEMA applies exclusively to "text messages" and "electronic mail" (*i.e.*, email), it categorically does not apply to messages sent over Facebook Messenger and other social media platforms. Indeed, "electronic text messages" under CEMA are SMS-type text messages "sent to a cellular telephone," RCW § 19.190.010(6), which plaintiff now concedes are not at issue. This leaves only "electronic mail messages" (that is, emails[5]) which by definition must be sent "to an electronic mail address" (that is, an email address) "and a reference to an internet domain … to which an electronic mail message can be sent or delivered." RCW §§ 19.190.010(4)–(5). Applying these CEMA provisions, the Washington Supreme Court has held that "[t]he definition of the term commercial electronic mail message and its use in RCW § 19.190.020 means that ***this statute applies only to commercial e-mails***." *Brown v. Old Navy, LLC*, 4 Wash.3d 580, 584 (App. Div. 2025); *see generally Chen v. Sur La Table, Inc.*, 655 F. Supp. 3d 1082, 1092 (W.D. Wash. 2023) (CEMA "prohibits false and misleading information as to the nature of the ***email"***); *State v. Heckel*, 93 P.3d 189, 194 (App. Div. 2004) (CEMA "does not regulate the body of the ***e-mail***, only the subject line.").

Plaintiff's core argument on this point—that the Facebook Messenger message supposedly is "electronic mail" because it traveled over "TCP/IP protocols" and was "routed through" facebook.com and/or messenger.com, FAC ¶¶ 43, 81—misses the mark. CEMA applies based on the endpoint to which a message is delivered. If it arrives to "a cellular telephone … equipped with short message service," then it is a text message regardless of whether it "is initiated as a short message service message or as an electronic mail message." RCW § 19.190.010(6). And if the message arrives to "an electronic mail address," then it is an email. RCW § 19.190.010(5). A

[5] The ordinary meaning of "electronic mail" is "email;" they are one and the same. *See* Black's Law Dictionary (12th ed. 2024) ("electronic mail (email)"); *Electronic Mail*, MERRIAM WEBSTER (last visited Oct. 1, 2026), www.merriam-webster.com/dictionary/electronic%20mail (defining "[e]lectronic mail" as "email"); *see also Email*, MERRIAM WEBSTER (last visited Oct. 1, 2026), www.merriam-webster.com/dictionary/email (the etymology of "email" is "electronic mail").

Facebook Messenger message is neither; instead, it is an in-application message delivered from one Facebook Messenger account to another such account. Plaintiff's contrary theory that any message using "TCP/IP protocols" and generally referencing an internet domain is "electronic mail," FAC ¶¶ 43, 81, would impermissibly collapse CEMA's text-or-email distinction and sweep in all social media posts, chats, and notifications received by app users over the internet.

Furthermore, with respect to the supposed "Facebook messenger address" that serves as the lynchpin of his CEMA claim, plaintiff conclusorily asserts only that, "The Facebook message … was … sent to an electronic mail address (his Facebook messenger address) with a reference to the facebook.com and/or messenger.com internet domains." FAC ¶ 81. Plaintiff tellingly never identifies this "Facebook messenger address," and his threadbare recital that some unspecified and undefined "address" must somehow exist does not suffice to plead his claim.

***Second,*** even if the Facebook Messenger message constituted an "electronic mail message" (it does not), CEMA applies only to such emails sent "from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident." RCW § 19.190.020(1); *see* RCW § 19.190.030(1). But plaintiff fails to plead that Jennifer and/or Kalshi sent the Facebook Messenger message to him from a computer in Washington or knew that plaintiff was a Washington resident. Plaintiff's generalized allegations that Kalshi "promotes its referral program nationwide, including in Washington," "keeps track of the geographic location of the consumers who click the link and fill out the [referral] form, which has included Washington residents," and "knows that existing users have contacts in Washington" do not establish knowledge of ***plaintiff's*** location.[6] FAC ¶¶ 49, 53.

***Third,*** the CEMA provision on which plaintiff relies proscribes only false or misleading information ***"in the subject line."*** RCW §§ 19.190.020(1)(b), 19.190.030(1)(b); FAC ¶¶ 56–65.

---

[6] Plaintiff does not allege that he "click[ed] the link and fill[ed] out the [referral] form," FAC ¶ 49, thereby notifying Kalshi of his location—which, in any event, would (at most) have put Kalshi on such notice only after Jennifer had already sent the message to plaintiff—or that his Washington residency was "available, upon request, from the registrant" of the facebook.com or messenger.com domains per RCW 19.190.020(2).

But, unlike an email message which has an obvious and universally understood subject line, the Facebook Messenger message has no such identifiable "subject line"—or, to the extent that it does, that subject line would logically be the phrase "Sign up for Kalshi with my link and we'll both get $25," which appears at the top of the message and which plaintiff does not assert is false or misleading. Plaintiff nevertheless contends that it is instead the phrase "Jennifer invited you to trade on Kalshi" that "is the subject line" because it supposedly "summarizes and is displayed prominently before the user engages with the body of the link," FAC ¶ 56, but this account is plainly refuted by plaintiff's own image of the message, which shows that this language appears ***at the very end of the message:***




FAC ¶ 76. The language at the bottom end of the message, which will naturally be seen and read (if at all) ***after*** the body text, the hyperlink, and the "$25" image, is not a "subject line."

***Fourth,*** CEMA affords no freestanding private action for damages. *See Dawson v. Porch.com*, 2024 WL 4765159, at *9 (W.D. Wash. Nov. 13, 2024) ("[M]onetary relief cannot be obtained under CEMA."); *Wright v. Lyft, Inc.*, 189 Wash.2d 718, 723, 406 P.3d 1149, 1151 (2017) ("RCW § 19.190.040 does not provide an independent cause of action.").

To the extent CEMA provides a private cause of action for injunctive relief, it is unavailable here: "to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022).[7] Plaintiff has an

[7] Plaintiff's request for injunctive relief also independently fails for want of any concrete and immediate threat of future harm, given plaintiff alleges having received only a single message.

adequate legal remedy and cannot allege otherwise—he seeks damages under the CPA for the same conduct. *See* FAC ¶¶ 100–109; *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (a plaintiff "must establish that she lacks an adequate remedy at law" before obtaining equitable relief).

Because plaintiff can seek neither damages nor equitable relief under CEMA, the claim necessarily fails. *See Gragg v. Orange Cab Co.*, 145 F. Supp. 3d 1046, 1052 (W.D. Wash. 2015) ("The legislature obviously knew how to create a private right of action under CEMA and chose to limit that action to injunctive relief when the wrongful conduct involved commercial emails."); *see also Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1129 (9th Cir. 2020) ("'The necessary prerequisite' for a court to award equitable remedies is 'the absence of an adequate remedy at law.'").

***Fifth,*** section 230 of the Communications Decency Act ("CDA") "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Jensen v. Cap. One Fin. Corp.*, 2025 WL 606194, at *2 (W.D. Wash. Feb. 25, 2025). Specifically, section 230 "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009), *as amended* (Sept. 28, 2009). Kalshi is a "provider or user of an interactive computer service" that plaintiff "seeks to treat, under [CEMA], as a publisher or speaker." *Id.* Accordingly, the only remaining point of possible contention is whether the "information" in question was "provided by another information content provider." *Id.* Plaintiff is silent as to whether Jennifer edited the message she allegedly took from Kalshi, asserting only that "[t]he 'Refer a friend' message contained text that was composed by Kalshi," FAC ¶ 80, without addressing whether it ***also***

---

*See, e.g.*, *Dawson*, 2024 WL 4765159, at *9 ("1,159 texts … and … 12 texts in … four years … do not give rise to a plausible inference that the CEMA violations are on-going or that injunctive relief might be appropriate.").

contained text written (or removed) by Jennifer. To the extent that Jennifer did edit the message, Kalshi cannot be assigned liability under section 230.

**B. In Any Event, CEMA's Substantive Elements Are Insufficiently Pled**

Even if plaintiff could overcome these numerous threshold hurdles (he cannot), he fails to plausibly allege that Kalshi "initiated," "assisted," or "conspired" in the transmission of the Facebook Messenger message—much less that any subject line thereof was false or misleading.

***No Initiation.*** CEMA defines the phrase "initiate the transmission" as "***the action by the original sender*** of an electronic mail message." RCW § 19.190.010(7). By plaintiff's own account, Kalshi is not the "original sender." Instead, it is plaintiff's Facebook friend, Jennifer, who copied her referral link and a referral message and transmitted those through her chosen application (*i.e.*, Facebook Messenger) to the recipient she selected (*i.e.*, plaintiff). *See* FAC ¶¶ 25–28, 76. On those allegations, the only person who could have "initiated" the message within the meaning of the statute is Jennifer—not Kalshi.

Because Kalshi did not send the message, the only way for plaintiff to attribute "initiation" to Kalshi is to impute Jennifer's act to it through one or more theories of agency—the same set of theories plaintiff unsuccessfully relies on in the jurisdictional context. *See* Section I, *supra*. Such theories fail here for the same reasons.

Actual agency is absent because it requires that the purported agent act on the principal's behalf and "subject to the principal's control." *Williams*, 851 F.3d at 1024; *see Moss v. Vadman*, 77 Wash. 2d 396, 402–03, 463 P.2d 159, 164 (1969) ("[A]n agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control."). Plaintiff does not allege Kalshi had any right to control whether, when, how, or to whom any user—including Jennifer—sends messages.

Apparent authority is similarly lacking—it requires that plaintiff have "actually, or subjectively, believe[d] that [Jennifer] ha[d] authority to act for [Kalshi]," where such "actual, subjective belief is objectively reasonable." *King v. Riveland*, 125 Wash.2d 500, 507, 886 P.2d

160 (1994). It is manifestly unreasonable for plaintiff to have believed that the message he received was sent "on Kalshi's behalf" when—by plaintiff's own admission—it was sent by his personal contact, Jennifer, and contained several explicit indicia that Jennifer was sending it on her own behalf—*i.e.*, "***Jennifer*** invited you," "Sign up for Kalshi with ***my*** link and ***we'll both*** get $25," FAC ¶ 76, and "***Jennifer*** sent you $25 on Kalshi," Ta Decl., Ex. 6. The alleged facts simply do not support apparent agency or agency of any sort.[8] *Cf. Sundstrom v. Ocean Reef Media LLC*, 2026 WL 1361646, at *4 (W.D. Wash. May 15, 2026) ("Apparent authority cannot be established merely by showing that the agent claimed authority or purported to exercise it, but must be established by proof of ***something said or done by the principal*** on which the third party reasonably relied." (cleaned up)).

***<u>No Assistance.</u>*** Plaintiff's fallback—that Kalshi "assisted" the transmission, FAC ¶ 3, fares no better. CEMA does not impose liability on everyone who makes a message possible. Instead, it defines "assist the transmission" in relevant part as follows:

> "Assist the transmission" means actions taken by a person to provide ***substantial assistance or support which enables*** any person to formulate, compose, send, originate, initiate, or transmit a commercial [email] … when the person providing the assistance ***knows or consciously avoids knowing that the initiator*** of the commercial [email] … is engaged***, or intends to engage, in any practice that violates the [CPA].***

RCW § 19.190.010(1). In other words, as applied here, CEMA "assistance" requires both (i) substantial assistance or support, *see also* Section III.A., *infra*, and (ii) knowledge, or conscious avoidance of knowledge, that the initiator is engaged, or intends to engage, in the transmission of

---

[8] Notwithstanding plaintiff's contention to the contrary, *see* FAC ¶ 49 ("Kalshi also ratifies the initiation"), the concept of "ratification" does not provide a standalone basis upon which Jennifer's acts could be imputed to Kalshi, as ratification comes into play only where "the actor acted or purported to act as an agent on the person's behalf." Restatement (Third) of Agency § 4.03. Because, as already demonstrated, Jennifer possessed neither actual nor apparent authority under the facts alleged, any supposed "ratification" is immaterial. *See id.* § 4.03 cmt. b. ("When an actor is not an agent and does not purport to be one, … ratification is not a basis on which another person may become subject to the legal consequences of the actor's conduct.").

a commercial electronic mail message containing a false or misleading subject line (*i.e.*, a violation of CEMA).

At bottom, plaintiff alleges, at most, that Kalshi provides users with a copyable referral link and (on its mobile app only) an editable referral message. Plaintiff's allegations do not establish that Kalshi at any point knew or deliberately avoided knowing that a user had decided to employ any particular medium to send a message containing a false or misleading subject line to a Washington resident specifically, much less that Kalshi possessed such knowledge or conscious avoidance before or contemporaneously with the message transmission. *See* BACKGROUND, *supra*. Therefore, Kalshi's alleged conduct does not rise to the level of "substantial assistance" with the requisite scienter.

This deficiency becomes especially evident when comparing plaintiff's allegations to those in other CEMA "refer a friend" cases in this District that have survived motions to dismiss:

- In *Wright v. Lyft, Inc.*, the "process involves a Lyft user opening the application, clicking on the 'Settings' menu, selecting 'Invite Friends,' then selecting one or multiple individuals from the user's contacts or 'Select All,' and, finally, agreeing to 'Send Invites.'" 189 Wash. 2d 718, 721 (2017). This "enable[s] the Lyft app to access non-user data on their cell phones," 2016 WL 7971290, at *1 (W.D. Wash. Apr. 15, 2016), and to "automatically transmit programmatically generated … advertisements," Second Amended Complaint (ECF No. 62) at ¶ 16, *Wright v. Lyft, Inc.,* No. 2:14-cv-00421-BJR (W.D. Wash. Apr. 4, 2016) [Keller Decl., Ex. 1].[9] By contrast, Kalshi is not alleged to have accessed its users' contacts or provided its users with tools to facilitate the sending of multiple messages at once—nor did it.

[9] As used throughout, this notation denotes that the document in question is appended as an exhibit to the Declaration of Nicolas G. Keller ("Keller Decl."), ECF No. 21, and is subject to Kalshi's separately filed request for judicial notice.

- In *Moore v. Robinhood Fin. LLC*, Robinhood provided its users with two referral options, both of which purposefully facilitated the sending of messages to multiple recipients at once. *See* First Amended Complaint (ECF No. 54) at ¶¶ 30–32, No. 2:21-cv-01571-BJR (W.D. Wash. Feb. 9, 2022) [Keller Decl., Ex. 2]. Specifically, "the Robinhood App accesses the user's address book, displays the user's contacts in the Robinhood App, and sometimes recommends particular recipients. Using the 'Share Link' method skips the step of the Robinhood App displaying these recommendations and instead directs the user to the native address book on the user's phone." *Id.* at ¶ 31 n.10; *see also Moore v. Robinhood Fin. LLC*, 2022 WL 3082969, at *1 (W.D. Wash. Aug. 3, 2022). Kalshi is not alleged to have accessed, displayed, or recommended contacts—rather, any recipient selection happens wholly outside any Kalshi interface.
- Similarly, in *Bottoms v. Block, Inc.*, Cash App "accesses the user's phone contacts," and "***generates a text message directed to the contact***." Class Action Complaint (ECF No. 1–2) at ¶¶ 27 & 29, No. 2:23-cv-01969-MJP (W.D. Wash. Dec. 21, 2023) [Keller Decl., Ex. 3]. In contrast, Kalshi is not alleged to have accessed user contacts or created such ***"pre-addressed"*** messages, much less within the Kalshi app itself. *Id.* ¶ 30; *see also Bottoms v. Block, Inc.*, 2024 WL 1931690, at *2 (W.D. Wash. May 2, 2024).
- In *Charles v. Chime Fin., Inc.*, Chime "accesses the user's phone contacts and allows the user to select individuals," and "gamif[ies] the referral process, further incentivizing its users to spam their contacts." Class Action Complaint (ECF No. 18) at ¶¶ 20 & 23, No. 2:25-cv-01361-KKE (W.D. Wash. Sept. 5, 2025) [Keller Decl., Ex. 4]; *see also White v. Chime Fin. Inc.*, 2026 WL 1506075, at *1 (W.D. Wash. May 29, 2026). Once again, Kalshi is not alleged to access contacts, and no volume-scaled "spam your contacts" incentive of that kind is pleaded either.

In sum, unlike in these other cases, at no point is Kalshi alleged to have accessed or mined users' contacts, to have used any such information to mass spam those contacts, or to have otherwise facilitated mass spamming—the very conduct at the heart of CEMA's prohibitions. *See, e.g.,* RCW § 19.190.060 ("Intent—2003 c 137 … 'The legislature recognizes that the number of unsolicited commercial text messages sent to cellular telephones and pagers is increasing. … These unsolicited messages often result in costs to the cellular telephone and pager subscribers in that they pay for use when a message is received.'"). Providing a copyable referral link and (on mobile only) an editable, medium-agnostic message as Kalshi is alleged to have done is not the knowing "substantial assistance" that CEMA proscribes. *See* RCW § 19.190.010(1).

***No Conspiracy.*** Plaintiff alleges in conclusory fashion that, "Kalshi is conspiring with its users to initiate the transmission of commercial electronic mail messages" that violate CEMA. FAC ¶ 60; *see id.* ¶¶ 61, 65. Because CEMA does not define "conspire," the common-law elements of conspiracy apply, which includes that "the conspirators entered into an agreement to accomplish the object of the conspiracy." *Wilson v. State*, 84 Wn. App. 332, 350–51, 929 P.2d 448 (1996); *see also In re King County's Foreclosure of Liens*, 117 Wn.2d 77, 86, 811 P.2d 945 (1991) ("The Legislature is presumed to know existing case law in areas in which it is legislating."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 53, at 320–21 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning."). However, plaintiff does not (and cannot) allege any such agreement between Kalshi and Jennifer.

***Not False or Misleading.*** Plaintiff's theory of falsity rests on a false dichotomy. He alleges recipients "are not being invited to 'trade'" because "[t]hey are being invited to gamble." FAC ¶ 57. But "trade" accurately describes the activity in question regardless of whether particular trades may also ultimately be legally deemed "gambling." Courts consistently describe the transactions at issue as "trades," including courts that have determined at the preliminary-injunction stage that certain of those trades also likely constitute "gambling." *See, e.g.*, *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *8 (9th Cir. Aug. 28, 2026) ("[T]here is no

dispute Kalshi's sports event contracts are traded on a DCM."); *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 225 (3d Cir. 2026) (Kalshi customers "buy and trade" positions); *State v. KalshiEX, LLC*, No. 26-2-10264-3 SEA, slip op. at 9 (King Cnty. Super. Ct. Aug. 12, 2026) (referring to Kalshi users as "traders"). "Trading" and "gambling" therefore are not mutually exclusive descriptions, and plaintiff cannot plausibly allege falsity merely by deciding to attach his preferred legal characterization to an activity that is factually described.

The word "trade" also does not implicitly represent or connote legality, and therefore does not implicate the line of cases regarding alleged advertisements that, unlike here, directly addressed the legality of Kalshi's sports markets. *Compare Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466, at *15 (9th Cir. Sept. 16, 2026) ("'Sports Betting Legal in all 50 States on Kalshi' advertisement was an inactionable statement of opinion about the legality of Kalshi's products. … [A]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." (cleaned up)); *and Old Navy, LLC*, 4 Wash. 3d at 595–96 (distinguishing actionable factual representations under CEMA from nonactionable "subjective statements, opinions, and hyperbole"), *with KalshiEX, LLC*, No. 26-2-10264-3 SEA, slip op. at 4 (at preliminary injunction phase, finding ad that Kalshi offered "'legal betting in Washington state" likely misleading).

Furthermore, the only two types of event contract markets plaintiff asserts are "gambling" are "political betting offerings" and "sports wagering." *See* FAC ¶¶ 33–37. Yet, the FAC shows that Kalshi offers numerous other types of event contracts, including "Economics," "Financials," "Companies," and "Climate" markets. *Id.* ¶¶ 26. Accordingly, the referral message's generic invitation to "trade"—which does not specify or reference any particular market—is literally accurate, at a minimum, as to these undisputed markets. Plaintiff cannot manufacture falsity by

unilaterally deciding that an open-ended, generic invitation must have pointed to the specific markets he challenges rather than to the many he does not.[10]

**C. Plaintiff's CPA Claim Also Fails**

Plaintiff's CPA claim fails for the same reason his CEMA claim does—Kalshi neither "initiated" nor "assisted" the transmission of an commercial electronic mail message with a false or misleading subject line. *See Wick v. Twilio Inc.*, 2017 WL 2964855, at *6 (W.D. Wash. July 12, 2017) ("[P]laintiff has failed to adequately allege a CEMA violation and may not, therefore, pursue a derivative CPA claim.").

To the extent plaintiff also asserts a freestanding CPA claim premised on Kalshi's alleged violations of the Washington Gambling Act, that theory fails for lack of both constitutional and statutory injury. Plaintiff does not allege that he ever signed up for, traded, or lost money on Kalshi. He therefore suffered no injury from any alleged Gambling Act violation, and a generalized objection to Kalshi's business—untethered to any injury to plaintiff himself—does not confer Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 & n.1 (1992) (injury must be "concrete and particularized," must "affect the plaintiff in a personal and individual way," and must be "fairly … trace[able] to the challenged action of the defendant"). The only harms plaintiff does allege—that the referral message "occupied storage space" on his device, "utilized the device's computational resources," and "took [p]laintiff's time," FAC ¶ 85—arose, if at all, from his mere receipt of a message, not from Kalshi's alleged gambling operation. Those alleged harms independently fail as a matter of CPA law because they are not an "injury to a person's business or property." RCW 19.86.090.

[10] In any event, plaintiff does not (and cannot) plausibly plead that the full phrase "Jennifer invited you to trade on Kalshi" is false or misleading, as he does not (and cannot) contest that Jennifer did indeed invite him to trade on Kalshi, just as the challenged statement says.

## III. CEMA CANNOT CONSTITUTIONALLY BE APPLIED TO KALSHI'S REFERRAL EXPRESSION

Kalshi did not send or direct the electronic message plaintiff received. *See* BACKGROUND & Sections I–II, *supra*. Plaintiff instead seeks to impose liability on Kalshi for creating promotional expression—a referral link, image, and accompanying language—that a third party subsequently chose to transmit through Facebook Messenger. *See* FAC ¶¶ 25, 28, 75–80. Applying CEMA to that upstream creation of speech violates the First Amendment as applied to Kalshi. And that conclusion does not change because plaintiff now alleges that Kalshi's use of the word "trade" is misleading based on his disputed characterization of Kalshi's federally regulated event contracts as "gambling." *See* Section II.B., *supra*.

### A. Kalshi's Referral Expression Is Protected Commercial Speech

Plaintiff seeks to impose liability on Kalshi for creating promotional expression—a referral link, image, and accompanying language—that a third party subsequently chose to transmit through Facebook Messenger. FAC ¶¶ 25, 28, 75–80. That theory reaches Kalshi's creation of speech itself. CEMA defines "assist the transmission" to include substantial assistance or support enabling another person to "formulate [or] compose" a commercial electronic mail message, RCW § 19.190.010(1), and plaintiff alleges Kalshi itself "composes a message," FAC ¶ 25. Such "writing" is "***pure*** speech," and courts "have never seriously questioned that the processes of writing words down [is a] purely expressive activit[y] entitled to full First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010) (emphasis in original); *see also Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (Supreme Court has "expressly applied First Amendment protections to speech-creation processes"); *Bledsoe v. Ferry Cnty.*, 499 F. Supp. 3d 856, 871 (E.D. Wash. 2020) (writing "invokes [First Amendment] principles in nearly their purest form" (cleaned up)). Here, plaintiff seeks to impose liability based on the particular words Kalshi allegedly chose—most prominently, "invited you to trade on Kalshi." FAC ¶¶ 56–68, 78–80. The alleged conduct giving rise to liability is indisputably expressive.

Plaintiff contends that Kalshi's expression nevertheless falls outside First Amendment protection because describing activity on Kalshi as "trading" is misleading and promotes unlawful gambling. FAC ¶¶ 56–68. But Kalshi's referral expression is neither misleading nor a proposal to engage in unlawful activity and therefore remains protected commercial speech. *See Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–64 (1980).

***First,*** as shown in Section II.B., *supra*, at pp. 20–22, there is nothing false or misleading about saying that users "trade on Kalshi." "Trade" accurately describes the activity on Kalshi regardless of whether particular trades may also ultimately be legally characterized as "gambling," and the Kalshi referral makes no representation about the legality of the "trading" activity. Even if "trade" could be considered potentially misleading (it is not), that would not remove the referral from First Amendment protection. Only actually or inherently misleading commercial speech may be prohibited outright; ***potentially*** misleading speech remains subject to *Central Hudson* scrutiny. *See Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106–08 (9th Cir. 2004) (citing *In re R.M.J.*, 455 U.S. 191, 202–03 (1982)); *Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*, 512 U.S. 136, 146 (1994).

***Second,*** the challenged expression does not propose unlawful activity. The referral identifies no sport, election, wager, or other transaction plaintiff alleges Washington law prohibits; it simply invites the recipient to sign up for Kalshi and "trade on Kalshi." FAC ¶¶ 75–80; *see also* Section II.B., *supra*, at pp. 20–22. And trading on Kalshi is not uniformly unlawful in Washington. The preliminary injunction on which plaintiff's Gambling Act theory depends expressly permits Kalshi to continue offering its "Commodities," "Climate," "Economics," and "Finance" contracts to Washington users. *KalshiEX, LLC*, No. 26-2-10264-3 SEA, slip op. at 14. Thus, the challenged expression invites activity that can concededly be undertaken lawfully in Washington; only a recipient's subsequent choice of a particular contract could implicate the prohibitions on which plaintiff relies. *Central Hudson*'s threshold exception does not extend that far. *See Pittsburgh Press Co. v. Human Rels. Comm'n*, 413 U.S. 376, 389 (1973) (First Amendment interest is only "altogether absent when the commercial activity itself is illegal"); *Bigelow v. Virginia*, 421 U.S.

809, 825 (1975) (speech retains protection where it concerns "an activity that is legal," even where the forum State restricts that activity in other applications).[11] Kalshi's referral expression therefore remains protected commercial speech.

**B. CEMA's Application To Kalshi's Upstream Expression Fails *Central Hudson***

Because Kalshi's referral expression is protected, CEMA's restriction on its creation must satisfy *Central Hudson*. "The State must assert a substantial interest to be achieved;" "the restriction must directly advance the state interest involved;" and "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 U.S. 557, 564 (1980). Plaintiff cannot satisfy that standard as applied to Kalshi's antecedent creation of protected commercial expression.

1. <u>Restricting Kalshi's Upstream Expression Does Not Directly Advance CEMA's Regulatory Interests</u>

CEMA regulates commercial electronic communications sent into or from Washington under specified circumstances. *See* RCW §§ 19.190.020–.030. As applied here, however, the expression Kalshi allegedly created is neither misleading nor a proposal of unlawful activity. And at the point Kalshi formulates or composes that protected expression, no recipient has been selected, no Washington nexus established, and no transmission has occurred. The content may instead be edited, discarded, communicated orally, posted publicly, or transmitted only to recipients outside Washington.

As the party seeking to enforce the restriction, plaintiff carries the burden, which cannot be "satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). And the asserted harm here "does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent" independent choices by third parties. *Ashcroft v. Free*

[11] That conclusion is especially clear because the Courts of Appeals have divided over whether federal law permits state gambling regulation of even the sports-event contracts plaintiff identifies as unlawful. *Compare Flaherty*, 172 F.4th at 228–29, *with Assad*, 2026 WL 2543846, at *17. However, the Court need not wade into the preemption dispute because Plaintiff's theory fails even on its own terms.



QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000

*Speech Coalition*, 535 U.S. 234, 250 (2002). After Kalshi creates the referral expression, a user must decide whether to send it at all, through what medium, and to whom. The FAC itself illustrates the point. On mobile, plaintiff alleges Kalshi creates content "for sharing," but acknowledges that "[u]sers then send the message and link to their contacts." FAC ¶ 25. On the website, the intervening choices are even clearer: existing users "copy the referral link, paste it into a messaging platform, and send the messages and link to their friends." *Id.* ¶ 28.

The Supreme Court has repeatedly invalidated precisely this kind of upstream speech restriction: "[W]e have never held that the government itself can shut off the flow of mailings to protect those recipients who might potentially be offended" as "the short, though regular, journey from mail box to trash can is an acceptable burden, as least so far as the Constitution is concerned." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) (cleaned up & collecting cases); *see, e.g.*, *Linmark Assocs. v. Willingboro*, 431 U.S. 85, 94 (1977) (striking down an ordinance targeting speech based on its "'primary' effect that [it] will cause those receiving the information to act upon it"). A restriction that burdens Kalshi's composition to prevent speculative, mediated harm dependent on another person's choices provides only "ineffective or remote support for the government's purpose" under *Central Hudson*. 447 U.S. at 564.

2. <u>Less Restrictive Alternatives Are Available</u>

CEMA's application to Kalshi also reaches further than necessary. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). The obvious alternative here is to regulate the sender—the party who selected the recipient and controls transmission—as CEMA's "initiation" liability already does. *See W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095–96 (9th Cir. 2001). Indeed, the FAC acknowledges that Kalshi's users themselves choose to send those materials to their own contacts through independently selected messaging platforms. FAC ¶¶ 25, 28, 44–53. "In the absence of a showing that more limited speech regulation would be ineffective," a court "cannot approve the complete suppression" of protected commercial expression. *Central Hudson*, 447 U.S. at 571. Whatever authority Washington possesses to

regulate electronic messages actually sent from or to Washington, it does not follow that Washington may impose liability on a separate speaker (Kalshi) merely for creating expression that another person (Jennifer) independently chooses to disseminate. Accordingly, CEMA is unconstitutional as applied to plaintiff's claims against Kalshi.

## IV. THE CLASS ALLEGATIONS SHOULD BE STRICKEN

In the alternative, the Court should strike the class allegations under Rule 12(f) and Rule 23(d)(1)(D), because the FAC shows on its face that Rule 23 cannot be satisfied. *See Hoffman v. Hearing Help Express, Inc.*, No. 3:19-CV-05960-RBL, 2020 WL 4729176, at *2 (W.D. Wash. Mar. 27, 2020) ("Courts have utilized these rules to strike allegations in a class action complaint prior to discovery.").

***No Classwide Standing.*** The class definition—"all persons who … received a Kalshi 'Refer a friend' electronic mail message inviting them to 'trade' while residing in Washington," FAC ¶ 87—contains no limitation to only those recipients who did not want the message. It therefore sweeps in Washington recipients who solicited or welcomed the referral, and those who accepted it by signing up for Kalshi—recipients who suffered no concrete Article III injury. *See Nuri v. True Religion Apparel*, 2026 WL 864886, at *3 (W.D. Wash. Mar. 30, 2026) (no standing where "[t]here is no allegation that any of the relevant emails were unsolicited," and the plaintiff wished to keep receiving them). Because "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a class defined to include uninjured, willing recipients cannot be certified.

***No Ascertainability.*** Independently, the class as defined cannot be identified by any objective, class-wide criterion. Whether a person is a member turns on facts not susceptible to common proof—whether that particular person received a referral a ***third party*** chose to send, whether the person then resided in Washington, and the circumstances of each exchange—so membership could be determined only through individualized, recipient-by-recipient inquiry. *See Cashatt v. Ford Motor Co.*, 2021 WL 1140227, at *2–3 (W.D. Wash. Mar. 24, 2021).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC for lack of personal jurisdiction, for failure to state a claim, on First Amendment grounds, and—in the alternative—should strike the FAC's class allegations.

Pursuant to section V(G) of the Court's Standing Order (ECF Nos. 5 & 5-1), Kalshi conferred with plaintiff on September 30, 2026, regarding the relief sought by this motion. The parties did not resolve the issues that would have avoided the need for this motion.

Dated: October 2, 2026

By: */s/ Matthew Hosen*
Matthew Hosen
matthosen@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Tel: (206) 905-7000
Fax: (206) 905-7100

Avi Perry*
aviperry@quinnemanuel.com
Rachel Frank Quinton*
rachelquinton@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8000
Fax: (202) 538-8100
(*Admitted *Pro Hac Vice*)

John W. Baumann*
jackbaumann@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Tel: (213) 443-3000
Fax: (213) 443-3100
(*Admitted *Pro Hac Vice*)

Nicolas G. Keller*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7(e)(4), I certify that this memorandum contains 8,394 words and therefore does not exceed 8,400 words.

Dated: October 2, 2026

By: */s/ Matthew Hosen*
Matthew Hosen



QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
Tel: (206) 905-7000