**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

NICHOLAS BROWN, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

KALSHI INC.,

*Defendant*.

Case No. 2:26-cv-01426-LK

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT KALSHI INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, TO STRIKE CLASS ALLEGATIONS**

Hon. Lauren King

NOTE ON MOTION CALENDAR:
December 11, 2026



Kothari Law LLC
555 SE Martin Luther King Blvd
Suite 3022
Portland, OR 97214

# TABLE OF CONTENTS


BACKGROUND AND INTRODUCTION .................... 1

ARGUMENT .................... 2

I. The Court Has Specific Personal Jurisdiction Over Kalshi .................... 2

A. Legal standard. .................... 2

B. Kalshi's own Washington referral activities support purposeful direction. .................... 3

C. Brown's claims relate to Kalshi's Washington referral activity. .................... 4

D. Alternatively, Jennifer's contacts are attributable to Kalshi. .................... 5

E. Kalshi has not shown jurisdiction is unreasonable. .................... 5

F. Alternatively, jurisdictional discovery is warranted. .................... 5

II. The FAC States Claims Under CEMA and the CPA .................... 6

A. Legal standard. .................... 6

B. The Message is an electronic mail message. .................... 6

C. The FAC pleads knowledge of Washington residency. .................... 9

D. The subject line is misleading. .................... 10

i. The link title is the subject line. .................... 10

ii. "Trade on Kalshi" is misleading. .................... 11

E. Kalshi is liable for the Message's transmission. .................... 13

i. Kalshi substantially assisted the transmission. .................... 13

ii. Alternatively, Kalshi initiated the Message through agency or conspiracy. .................... 16

F. Communications Decency Act § 230 does not immunize Kalshi. .................... 17

G. Brown may seek prospective injunctive relief under CEMA. .................... 18

H. Brown states a CPA claim. .................... 19

III. The First Amendment Does Not Bar Brown's Claims .................... 19

IV. The Class Allegations Should Not Be Stricken .................... 23

CONCLUSION .................... 24

## TABLE OF AUTHORITIES

**Cases**

*American Academy of Pain Management v. Joseph, 353 F.3d 1099 (9th Cir. 2004)* .................... 20
*Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002)* .......................................................... 22
*Ashcroft v. Iqbal, 556 U.S. 662 (2009)* ........................................................................................ 6
*Barnes v. Yahoo!, Inc., 570 F.3d 1096 (9th Cir. 2009)* ................................................................ 18
*Bigelow v. Virginia, 421 U.S. 809 (1975)* ...................................................................................... 20
*Blue Lake Rancheria v. Kalshi, Inc., 191 F.4th 1071 (9th Cir. 2026)* .................................... 12, 13
*Board of Trustees of State University of New York v. Fox, 492 U.S. 469 (1989)* .......................... 22
*Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983)* ...................................................... 22
*Bottoms v. Block, Inc., 2024 WL 1931690 (W.D. Wash. May 2, 2024)* ........................................ 14
*Briseno v. ConAgra Foods, Inc., 844 F.3d 1121 (9th Cir. 2017)* .................................................. 24
*Briskin v. Shopify, Inc., 135 F.4th 739 (9th Cir. 2025) (en banc)* ........................................ 3, 4, 5
*Bristol-Myers Squibb Co. v. Superior Court, 582 U.S. 255 (2017)* ................................................ 5
*Brown v. Old Navy, LLC, 4 Wash. 3d 580 (2025)* .........................................................9, 10, 11, 19
*Burri Law PA v. Skurla, 35 F.4th 1207 (9th Cir. 2022)* ................................................................... 6
*Cashatt v. Ford Motor Co., 2021 WL 1140227 (W.D. Wash. Mar. 24, 2021)* .............................. 24
*Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980)* 20, 21, 22
*Clark v. Eddie Bauer LLC, 2024 WL 177755 (9th Cir. Jan. 17, 2024)* ........................................ 18
*Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280 (9th Cir. 1977)* ................ 3
*Davidson v. Kimberly-Clark Corp., 889 F.3d 956 (9th Cir. 2018)* ................................................ 19
*Dawson v. Porch.com, 2024 WL 4765159 (W.D. Wash. Nov. 13, 2024)* ...................................... 18
*Edenfield v. Fane*, 507 U.S. 761 (1993) ........................................................................................ 21
*Escambia County v. McMillan, 466 U.S. 48 (1984)* ...................................................................... 20
*Facebook, Inc. v. MaxBounty, Inc., 274 F.R.D. 279 (N.D. Cal. 2011)* ........................................ 8, 9
*Fair Housing Council v. Roommates.Com, LLC, 521 F.3d 1157 (9th Cir. 2008) (en banc)* ......... 18
*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351 (2021)* ........................................ 4, 5
*Guzman v. Polaris Industries Inc., 49 F.4th 1308 (9th Cir. 2022)* ................................................ 18
*Hall v. Smosh Dot Com, Inc., 72 F.4th 983 (9th Cir. 2023)* .......................................................... 19
*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068 (9th Cir. 2019) ............................ 17

*Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453 (S.D.N.Y. 2020) .................................... 20
*Hoffman v. Hearing Help Express, Inc.*, 2020 WL 4729176 (W.D. Wash. Mar. 27, 2020) ........... 23
*Hood v. American Auto Care, LLC*, 21 F.4th 1216 (10th Cir. 2021) ............................................ 5
*Internet Community & Entertainment Corp. v. Washington State Gambling Commission*, 169 Wash. 2d 687 (2010) ........................................................................................................ 12
*Jensen v. Capital One Financial Corp.*, 2025 WL 606194 (W.D. Wash. Feb. 25, 2025) ........ 18, 23
*KalshiEX, LLC v. Assad*, 190 F.4th 1098 (9th Cir. 2026) .......................................................... 13
*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ............................................ 6
*King v. Riveland*, 125 Wash. 2d 500 (1994) ............................................................................. 5, 16
*Klem v. Wash. Mut. Bank*, 176 Wash. 2d 771 (2013) ................................................................. 13
*Moore v. Robinhood Financial LLC*, 2022 WL 3082969 (W.D. Wash. Aug. 3, 2022) ................. 14
*Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001) ...................................................... 5
*MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391, 2007 WL 1686966 (C.D. Cal. Feb. 27, 2007) .................................................................................................................................. 8, 9
*MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293 (C.D. Cal. 2007) ....................................... 7, 8, 9
*Nuri v. True Religion Apparel, Inc.*, 2026 WL 864886 (W.D. Wash. Mar. 30, 2026) .................... 23
*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) ............................................................................................................... 24
*Panag v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27 (2009) ...............................................11, 13
*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973) ....... 20
*Rousso v. State*, 170 Wash. 2d 70 (2010) .................................................................................... 12
*Sant v. RocketReach LLC*, 790 F. Supp. 3d 1145 (W.D. Wash. 2025) .......................................... 23
*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ................................ 3, 5
*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ............................................... 18
*State v. Heckel*, 122 Wash. App. 60 (2004) ........................................................................ 9, 10, 20
*State v. KalshiEX, LLC*, No. 26-2-10264-3 SEA (King Cnty. Super. Ct. Aug. 12, 2026) 2, 11, 12, 21
*Sundstrom v. Ocean Reef Media LLC*, 2026 WL 1361646 (W.D. Wash. May 15, 2026).............. 16
*United States v. Williams*, 553 U.S. 285 (2008) .......................................................................... 20
*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) ............................. 19, 23
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .................. 21

*Walden v. Fiore*, 571 U.S. 277 (2014) ........ 4
*Wright v. Lyft, Inc.*, 189 Wash. 2d 718 (2017) ........ 18, 19
*Yamashita v. LG Chem, Ltd.*, 62 F.4th 496 (9th Cir. 2023) ........ 5

**Statutes**

15 U.S.C. § 7702 ........ 7
47 U.S.C. § 230 ........ 18
RCW 19.190.010 ........ passim
RCW 19.190.020 ........ passim
RCW 19.190.030 ........ 13, 15, 19
RCW 19.190.040 ........ 19
RCW 19.190.060 ........ 15
RCW 19.190.090 ........ 18
RCW 19.86.020 ........ 13
RCW 4.24.070 ........ 2, 13
RCW 9.46.010 ........ 13
RCW 9.46.0213 ........ 12
RCW 9.46.0245 ........ 12
RCW 9.46.0269 ........ 12
RCW 9.46.070 ........ 12
RCW 9.46.240 ........ 2, 12, 13

**Other Authorities**

Restatement (Third) of Agency § 2.03 ........ 16
Restatement (Third) of Agency § 4.01 ........ 17
Restatement (Third) of Agency § 4.03 ........ 17

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 6, 8, 13
Fed. R. Civ. P. 23 ........ 24
Fed. R. Civ. P. 8 ........ 9

**BACKGROUND AND INTRODUCTION**

Kalshi, Inc. ("Kalshi") offers gambling on the internet, including wagers on sports, elections, and other future events, and it collects transaction fees. Dkt. No. 28 ¶¶ 31–35, 69. It targets Washington consumers with advertisements stating, "I found a way to bet on the NFL even though we live in Washington." *Id.* ¶ 13. Through its "Refer a friend" program ("Program"), Kalshi pays its users up to $1,500 to send electronic mail messages to their contacts to entice them to sign up for Kalshi—including the message its user, Jennifer, sent to Brown via Facebook Messenger on February 6, 2026, while he resided in Washington ("Message"). *Id.* ¶¶ 22–28, 75–76. Kalshi promotes the Program to Washington users and tracks the locations of recipients who click the links and complete the referral form, including Washington residents. *Id.* ¶¶ 49, 51, 53. Kalshi generates a link for users to paste into an electronic messaging service, which renders the commercial invitation with the misleading subject line: "[User] invited you to trade on Kalshi." *Id.* ¶¶ 56, 77–80.



Months before the Message, the Washington State Gambling Commission issued a notice stating that "[o]ffering events-based contacts or participating in these markets is not authorized in Washington State"—a notice the King County Superior Court later found Kalshi's operating subsidiary had "willfully ignored" when enjoining its unlawful gambling and marketing activities in Washington. *State v. KalshiEX, LLC*, No. 26-2-10264-3 SEA, Order Granting Pl.'s Am. Mot. for Prelim. Inj., §§ I.3, I.16, II.1, II.11–19 (King Cnty. Super. Ct. Aug. 12, 2026) ("WA Injunction Order") (cited in Dkt. No. 30 at 23, 26).[1]

The Message Kalshi drafted concealed that the promoted "trade" was illegal gambling for Washington-focused bets it was specifically marketing to Washingtonians, including on Washington sporting events and Washington political races. Dkt. No. 28 ¶¶ 5, 13–14, 30–40, 56–57, 68. Washington consumers who place unlawful online wagers risk class C felony liability for knowingly transmitting or receiving gambling information over the internet and civil liability to losing bettors seeking to recover the money lost. RCW 9.46.240(1); RCW 4.24.070; Dkt. No. 28 ¶¶ 36, 39. Brown brings this class action to address Kalshi's Program.

## ARGUMENT

### I. The Court Has Specific Personal Jurisdiction Over Kalshi

#### A. Legal standard.

Without an evidentiary hearing, Brown need make only a prima facie showing of jurisdictional facts. Uncontroverted allegations are taken as true, and conflicts between the parties' affidavits are resolved in his favor; allegations contradicted by an unrebutted affidavit cannot

[1] Kalshi relies on this order's factual findings concerning its advertisements and its provisions addressing the markets available to Washington consumers. Dkt. No. 30 at 23, 26. On August 12, 2026, the King County Superior Court enjoined KalshiEX, LLC, Kalshi Inc.'s wholly owned subsidiary, finding the State likely to prevail on its Gambling Act and CPA claims and concluding that marketing the illegal gambling activities constituted unfair or deceptive conduct. It prohibited offering and marketing many categories in Washington—including sports and elections— while carving out several offerings. WA Injunction Order at §§ I.3, II.12, 16, 18, III(3). The order is available at https://agportal-s3bucket.s3.us-west-2.amazonaws.com/Consumer%20Protection/64_OrdGrantAmendMtnPI.pdf?VersionId=a9FvcaBwWpQETWxbKUdHL1jqjTOD6XAi.

simply be assumed true. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

**B. Kalshi's own Washington referral activities support purposeful direction.**

Specific jurisdiction requires purposeful direction or availment, a claim arising out of or relating to forum activities, and reasonableness. *Schwarzenegger*, 374 F.3d at 802. Purposeful direction requires an intentional act expressly aimed at the forum, causing harm the defendant knows is likely to be suffered there. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 751 (9th Cir. 2025) (en banc). *Briskin* rejects any additional requirement that a nationwide platform favor the forum over other States: the defendant's own deliberate forum contacts can suffice even though the defendant pursues a nationwide audience. *Id.* at 757–58.

Kalshi satisfies that standard. It intentionally promotes its Program to Washington users—to whom it supplies referral links and mobile promotional content and pays for qualifying referrals—and it tracks Washington participation. Dkt. No. 28 ¶¶ 22–28, 47, 49–53. Kalshi's Washington-specific advertising and markets on Washington elections and sporting events confirm its cultivation of that market. *Id.* ¶¶ 13–14, 33.

Kalshi knows the referral messages reach Washington residents without their affirmative consent and contain misleading promotional language. *Id.* ¶¶ 49–59, 62–63. And it knows that the resulting unwanted advertising and interference with recipients' devices and time are likely to cause injury there. *Id.* ¶¶ 12, 55–63, 75–85; *see Briskin*, 135 F.4th at 751, 755–56. Jennifer's choices are part of the recruitment mechanism Kalshi created and rewards: conduct a defendant solicits and pays for is not unilateral activity of a third person. Kalshi acknowledges that its mobile app supplies an editable template and referral link before recipient selection. Dkt. No. 30 at 8–10. Ta confirms that the February 2026 default mobile text matched the message's $25 invitation; he does not identify Jennifer's actual transmission workflow. Dkt. No. 31 ¶¶ 9–11. Brown attributes to Kalshi the creation and supported distribution of the challenged promotion, rather than merely his own residence or Jennifer's unilateral choices. Dkt. No. 28 ¶¶ 23, 50, 56, 62–63, 77–82.

Kalshi's effort to confine *Briskin* to its facts fails. Dkt. No. 30 at 13. That Kalshi learns a recipient's location only after a click, *id.*, bears on whether it aimed the Message at *Brown*, not whether it aimed its own conduct at *Washington*. And although *Briskin* requires no forum-specific targeting, such conduct remains evidence of express aiming. *Briskin*, 135 F.4th at 758. Kalshi supplies that evidence: ads aimed at Washingtonians ("I found a way to bet on the NFL even though we live in Washington"), Washington election and sports markets, promotion and payment of the Program among Washington users, and tracking of Washington referrals—all while knowing, before Jennifer sent anything, that unconsented messages reach Washington residents. Dkt. No. 28 ¶¶ 13–14, 33, 49–53, 55. Shopify's knowledge of a device's location mattered because the device was its forum contact; Kalshi's contacts are its Washington-directed marketing and Program, and the Message is the in-forum injury they were designed to produce.

*Walden v. Fiore*, 571 U.S. 277 (2014), does not require a different result: there, the plaintiffs were the defendant's only connection to the forum. Here, Kalshi's own Washington Program activities supply connections independent of Brown.

**C. Brown's claims relate to Kalshi's Washington referral activity.**

Kalshi argues that its Washington contacts (1) did not cause Jennifer's Message and (2) lack a meaningful nexus to the Message. Dkt. No. 30 at 12. But *Ford* rejected precisely this "exclusively causal test of connection" as "inconsistent with our caselaw." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 366 (2021). The "relate to" half of the standard "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. *Briskin* found relatedness when the plaintiff suffers the kind of injury the defendant's forum contacts tend to cause. 135 F.4th at 760.

Brown received the Message in Washington, which was generated through the Program Kalshi promotes in Washington, including by providing the content, image, and referral link. Dkt. No. 28 ¶¶ 12, 22–28, 49–53, 75–82. This Washington forum activity violates CEMA and the CPA, resulting in injuries to Washingtonians, just like the injury Brown suffered. *Bristol-Myers Squibb*

*Co. v. Superior Court*, 582 U.S. 255, 264–65 (2017), on the other hand, concerned nonresidents whose relevant purchases, use, and injuries occurred *outside* the forum.

*Hood v. American Auto Care, LLC*, 21 F.4th 1216, 1222–25 (10th Cir. 2021), is instructive. A call to a Colorado resident's Vermont number supported Colorado jurisdiction because the defendant deliberately conducted materially similar telemarketing in Colorado, even assuming the challenged call targeted Vermont. The Ninth Circuit cited *Hood* when explaining *Ford*'s relatedness requirement. *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505–06 (9th Cir. 2023). Here too, the claim relates to the promotional activity allegedly conducted in the forum; Brown does not rely on his residence alone.

**D. Alternatively, Jennifer's contacts are attributable to Kalshi.**

While Kalshi's forum contacts are sufficient, alternatively, apparent agency supports specific jurisdiction by imputing Jennifer's conduct to Kalshi. Kalshi supplied the Message, hyperlink, and company-funded offer; and Brown alleges those Kalshi manifestations caused him reasonably to believe Jennifer was extending Kalshi's promotion on its behalf. Dkt. No. 28 ¶¶ 48, 76–80; *King v. Riveland*, 125 Wash. 2d 500, 507 (1994); *see Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 & nn.2–3 (9th Cir. 2001) (considering apparent authority and ratification in attributing contacts). The ratification allegations discussed below in section II.E.ii likewise allow Jennifer's contacts to be imputed to Kalshi.

**E. Kalshi has not shown jurisdiction is unreasonable.**

Once the first two requirements are satisfied, Kalshi must present a "compelling case" that jurisdiction is unreasonable. *Schwarzenegger*, 374 F.3d at 802. Kalshi does not address reasonableness. Dkt. No. 30 at 11–13. Washington's interest in protecting its residents and Brown's interest in obtaining relief at home favor jurisdiction over the alleged Washington-directed activity. *See Briskin*, 135 F.4th at 760–61.

**F. Alternatively, jurisdictional discovery is warranted.**

If the Court finds a material factual gap, Brown requests limited discovery into Kalshi's Washington promotion of the Program, its preexisting geographic knowledge, and its role in

generating and distributing referral content. Discovery is warranted because the FAC identifies specific Washington-directed activities, and the relevant Program records are within Kalshi's control. *Cf. Burri Law PA v. Skurla*, 35 F.4th 1207, 1217–18 (9th Cir. 2022). That focused discovery would address the purportedly disputed jurisdictional facts before dismissal.

## II. <u>The FAC States Claims Under CEMA and the CPA</u>

### A. Legal standard.

A complaint survives Rule 12(b)(6) when its factual allegations, accepted as true, plausibly support relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Kalshi also requests consideration of facts outside the FAC, including screenshots recreated without contemporaneous snapshots and containing different promotional text. *See, e.g.*, Dkt. No. 32 at 2–6; Dkt. No. 31 ¶¶ 9–11. Incorporation by reference cannot be used to resolve disputed facts or draw inferences against the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1003 (9th Cir. 2018). Indeed, although Kalshi purports to provide "the complete, step-by-step mobile and website referral flows," it entirely omits what happens when the "Search contacts" button on the referral page is selected. Dkt. No. 32 at 6; Dkt. No. 28 ¶ 24.

### B. The Message is an electronic mail message.

Kalshi's categorical exclusion of Messenger messages from CEMA defies the statutory definitions. Dkt. No. 30 at 14–15. CEMA defines an electronic mail address as "a destination, commonly expressed as a string of characters, to which electronic mail may be sent or delivered." RCW 19.190.010(4). An electronic mail message is "an electronic message sent to an electronic mail address and a reference to an internet domain, whether or not displayed, to which an electronic mail message can be sent or delivered." RCW 19.190.010(5). Neither definition specifies an @ symbol or a particular email protocol.[2]

Brown alleges delivery to his individual Messenger address with a reference to the facebook.com and/or messenger.com domains, and reproduces the delivered private message. Dkt.

[2] Kalshi does not contest the commercial nature of the Message.



Kothari Law LLC
555 SE Martin Luther King Blvd
Suite 3022
Portland, OR 97214

No. 28 ¶¶ 42–43, 76, 81. His theory rests on the recipient-specific destination and its associated domain, not simply on use of internet protocols or inclusion of a website link.

Applying the analogous CAN-SPAM Act definition, a court found the “electronic mail address” requirement satisfied for internal social-media messages. *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1300 (C.D. Cal. 2007). Stripped of one additional requirement, CAN-SPAM’s definition is virtually identical to CEMA’s: “a destination, commonly expressed as a string of characters, . . . to which an electronic mail message can be sent or delivered.” 15 U.S.C. § 7702(5). *Wallace* held that this definition reaches destinations beyond traditional “user@domain.com” addresses. It held that MySpace messages qualified because each user’s mail resided at a unique URL containing the username and the myspace.com domain, and the messages carried corresponding destination and routing information. 498 F. Supp. 2d at 1300. The same reasoning supports coverage under CEMA: Brown alleges the Message was delivered to his individual Messenger address through infrastructure associated with the facebook.com and messenger.com domains. Dkt. No. 28 ¶¶ 42–43, 81.

The Message is also an “electronic mail message” under CEMA. *Wallace* is again instructive, as CEMA’s definition of “electronic mail message” is a combination of CAN-SPAM’s definitions for “electronic mail message” and “electronic mail address.” CAN-SPAM, in relevant part, defines an electronic mail address as “a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox . . . and *a reference to an Internet domain . . ., whether or not displayed, to which an electronic mail message can be sent or delivered*.” 15 U.S.C. § 7702(5). Far from excluding Facebook Messenger, this statutory language confirms that the Message is covered.

District courts in the Ninth Circuit have squarely held that internal social-media communications satisfy the “reference to an Internet domain” requirement in the analogous CAN-SPAM context. In *Wallace*, the court held that social-networking messages satisfy this requirement because (1) “[e]ach MySpace.com user’s mail resides on a unique URL, which includes a string of characters containing the member’s username and a reference to the domain ‘myspace.com,’”

and (2) the messages "contain header information, such as source, destination, and routing information, and references to the unique username and the myspace.com domain name." *Wallace*, 498 F. Supp. 2d at 1300–01 (citing *MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391, 2007 WL 1686966, at *4–5 (C.D. Cal. Feb. 27, 2007)). And in *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 283–84 (N.D. Cal. 2011), the district court applied *Wallace* and *The Globe.com* directly to a range of Facebook "destinations including the user's 'wall,' the 'news feed' or . . . the **Facebook inbox** of the user's friends." (Emphasis added). In *MaxBounty*, the court denied a Rule 12(b)(6) motion, including because these Facebook destinations were places where an electronic mail message could be sent.

The same is true here, if not more so: the Message was routed across the internet through infrastructure bound to centralized internet domain names—facebook.com and messenger.com—and delivered to Brown's unique Messenger account, a destination where electronic messages are sent and delivered. Dkt. No. 28 ¶¶ 42–43, 75–76, 81. Indeed, the Message sent to Brown satisfies RCW 19.190.010(5)'s domain requirement in *both* a non-displayed and displayed manner:[3] in addition to being routed through the facebook.com and messenger.com domains, *id.* ¶¶ 43, 81, the delivered Message visibly displays the internet domain reference "l.facebook.com" at the bottom of the Message card. *Id.* ¶ 76. Thus, whether "a reference to an internet domain, whether or not displayed" refers to the underlying routing domain (facebook.com / messenger.com) or a displayed domain (l.facebook.com), the FAC pleads both.

Kalshi's remaining arguments regarding the definition of electronic mail message fail. First, *Wallace* and *The Globe.com* inform Kalshi's "slippery slope" argument that applying CEMA here would "sweep in all social media posts, chats, and notifications received by app users over

[3] The statutory words "whether or not displayed" prove that the domain reference need not appear as a visible @domain.com suffix. If CEMA applied only to user@domain.com email addresses where the domain is visible, the phrase "whether or not displayed" would be superfluous. Instead, CEMA requires only that the electronic message be sent to an account destination ("electronic mail address") along with a displayed or non-displayed reference to an internet domain to which electronic messages can be sent.

the internet." Dkt. No. 30 at 15. Unlike *MaxBounty*—which extended the statutory definition to public wall posts and news-feed updates—Brown here received a private, one-to-one message delivered directly into his personal Facebook Messenger inbox, the exact equivalent of the private social-network inbox messages in *Wallace* and *The Globe.com*. Dkt. No. 28 ¶¶ 43, 75–76, 81. Second, *Brown v. Old Navy, LLC*, 4 Wash. 3d 580 (2025), is inapposite because the Court answered a certified question regarding subject line falsity; *Old Navy never* cited or analyzed RCW 19.190.010(4)–(5). Finally, Kalshi's argument that Brown failed to plead his personal Facebook account character string is baseless. Dkt. No. 30 at 15. As *Wallace* recognizes, every user account and inbox on a social-networking service inherently resides at a unique character-string destination tied to the platform's internet domain. 498 F. Supp. 2d at 1297, 1300. Pleading that the Message was delivered to Brown's personal Facebook Messenger account address referencing facebook.com and messenger.com—and reproducing the delivered Message itself showing l.facebook.com—easily satisfies Rule 8. Dkt. No. 28 ¶¶ 42–43, 76, 81. Kalshi itself characterizes the challenged transmission as an in-app[4] message delivered from one Facebook Messenger account to another. Dkt. No. 30 at 15. Read together, these allegations identify the recipient-specific electronic destination and the domains associated with delivery, rather than merely a website mentioned in the advertisement.

**C. The FAC pleads knowledge of Washington residency.**

CEMA applies to a message sent to an address that the sender knows or has reason to know is held by a Washington resident; transmission from Washington is an alternative, not an additional requirement. RCW 19.190.020(1). Kalshi's insistence on actual knowledge of Brown's location overlooks the reason-to-know standard. Dkt. No. 30 at 15. *State v. Heckel*, 122 Wash. App. 60, 67–70 (2004), rejects Kalshi's contention that liability requires proof that the sender knew which specific recipient addresses belonged to Washington residents. In *Heckel*, the defendant's

[4] The "in-app" label is also inaccurate: Messenger is accessible via standard web browser (Dkt. No. 31–3), and the Message traveled over the internet through the facebook.com and messenger.com domains.

unusually large transmission volume independently provided a reason to know. *Id.* at 69. Brown relies on a different factual combination: deliberate promotion to Washington users and monitoring that allegedly reveals Washington referrals. Dkt. No. 28 ¶¶ 49, 51, 53. Kalshi acknowledges it learns a recipient's location when a person clicks the link and executes the form. Dkt. No. 30 at 15 n.6. These allegations support knowledge of the program's Washington reach before Brown's particular message; they do not depend on a later click by Brown retroactively supplying notice.

The immediate sender's knowledge supplies a separate basis. Participating users allegedly know or have reason to know their referrals reach Washington residents because they send them to people they personally know; Brown identifies Jennifer as his contact and alleges his Washington residence. Dkt. No. 28 ¶¶ 54, 75–76, 80. Together, these allegations support an inference that Jennifer had reason to know where her acquaintance resided. The statutory reference to "the sender" makes that knowledge relevant.

Finally, the absence of an allegation that Facebook's domain registrant would disclose Brown's residence is not dispositive. Dkt. No. 30 at 15 n.6. This is just one way to impute knowledge, not the exclusive means of proving it. *Heckel*, 122 Wash. App. at 67; RCW 19.190.020(2).

**D. The subject line is misleading.**

**i. The link title is the subject line.**

Without any authority, Kalshi argues that the Message lacks a subject line because the challenged phrase—"Jennifer invited you to trade on Kalshi"—appears beneath the promotional image. Dkt. No. 30 at 15–16. This elevates screen position over the phrase's alleged function. CEMA does not define "subject line" or require that it appear above every image or accompanying sentence. In *Old Navy*, the Court explained that CEMA targets the header and subject line because they supply information consumers use when choosing whether to delete a message or engage with its content. 4 Wash. 3d at 590–91. The FAC alleges that Kalshi's prominently displayed referral title performs that summarizing function: it identifies the invitation and characterizes the activity the recipient is being encouraged to pursue, before the recipient engages with the linked content.

Dkt. No. 28 ¶¶ 56, 76, 78, 80. Kalshi itself describes the link as "titled, 'Jennifer invited you to trade on Kalshi.'" Dkt. No. 30 at 7. The issue is whether that title serves as the subject line in this electronic format, not whether it occupies the same position as a conventional email interface. This subject line function is reinforced by the phrase being featured prominently next to the Message's identification of the sender (Jennifer's photo), where a reader's attention may naturally be drawn to. Dkt. No. 28 ¶ 76.

**ii. "Trade on Kalshi" is misleading.**

Kalshi's "trade on Kalshi" subject line is "misleading" under RCW 19.190.020(1)(b) and .030(1)(b) because it misrepresents the service as innocuous "trad[ing]," while failing to disclose that its core gambling service is illegal in Washington. CEMA works hand-in-glove with the CPA, including by focusing on "a specific deceptive commercial practice: sending Washington residents commercial e-mails that contain 'false or misleading information in the subject line[s].'" *Old Navy*, 4 Wash. 3d at 591 (quoting RCW 19.190.020(1)(b)). The standard for deception under the CPA is informative as it includes "a representation, omission or practice that is likely to 'mislead' a reasonable consumer." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27, 50 (2009) (internal quotation omitted).

Here, inviting Washingtonians to trade on Kalshi misrepresents the "nature" of Kalshi's service by disguising illegal online wagering as lawful financial investing—omitting that it is illegal gambling.[5] *Old Navy*, 4 Wash. 3d at 596; Dkt. No. 28 ¶¶ 5, 30–40, 56–57, 68. Kalshi's

---

[5] The preliminary injunction in *State v. KalshiEX, LLC* supports that reasoning: the court found that Kalshi's "legal betting" advertisements likely misled reasonable consumers, that Kalshi continued soliciting Washington residents despite the Gambling Commission's express notice that event-based contracts were unauthorized, and that its activities did not qualify for the statutory exception for bona fide securities or commodities transactions. The court accordingly concluded that "Kalshi's provision, marketing, and advertising of illegal gambling activities constitute unfair and/or deceptive acts or practices in trade or commerce under RCW 19.86.020." WA Injunction Order at §§ I.14–16, II.11–12, II.19. Those conclusions reinforce Brown's allegation that the unqualified invitation to "trade on Kalshi" conceals information essential to evaluating the offer: whether Washington consumers may lawfully participate. Dkt. No. 28 ¶¶ 56–57, 68. Literally identifying Jennifer as the inviter (Dkt. No. 30 at 24 n.10) does not cure misrepresenting the nature of the transaction as "trading."

reliance on *Blue Lake Rancheria v. Kalshi, Inc.*, 191 F.4th 1071 (9th Cir. 2026) is unavailing. Dkt. No. 30 at 23. *Blue Lake* held under the Lanham Act that an explicit legal assertion ("Sports Betting Legal in all 50 States") was a lay opinion "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction." *Id.* at 1090. In Washington, clear and unambiguous rulings from both the state's gambling agency already existed *before* the February 6, 2026, Message was sent, and its highest Court had found that a company providing a similar service to Kalshi was engaged in professional gambling. In *Internet Community & Entertainment Corp. v. Washington State Gambling Commission*, 169 Wash. 2d 687, 691–96 (2010), the Washington Supreme Court affirmed summary judgment for the Gambling Commission against an online peer-to-peer exchange (Betcha.com). The Court held that facilitating wagers between users on future contingent events in exchange for fees constitutes "bookmaking" under RCW 9.46.0213 and therefore "professional gambling" under RCW 9.46.0269(1)(d)—as well as unlawful online transmission of "gambling information" (RCW 9.46.0245, .240)—even if the operator takes neither side of the wager. *Internet Community*, 169 Wash. 2d at 692–97; Dkt. No. 28 ¶¶ 35–37. In *Rousso v. State*, 170 Wash. 2d 70, 74–75, 82 (2010), the Court upheld RCW 9.46.240's ban on internet gambling, holding that "[s]ince sending and receiving gambling information is illegal, Internet gambling in the state of Washington is effectively banned." It was thus clear and unambiguous that Kalshi was engaged in bookmaking through its online betting platform, which constitutes professional gambling, and Kalshi's resulting transmission of gambling information is illegal.

Kalshi was also directly on notice that its service was illegal. On December 9, 2025—nearly two months *before* the Message to Brown—the Washington State Gambling Commission (the state agency of competent jurisdiction, RCW 9.46.070) issued an official notice that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State," which KalshiEX "willfully ignored." WA Injunction Order at §§ I.12, I.16, II.19 (cited in Dkt. No. 30 at 23, 26). Indeed, the preliminary injunction order enjoined Kalshi, concluding that

its Washington operations are not bona fide futures or commodities transactions, that its marketing of illegal gambling violates the CPA, RCW 19.86.020, and that prediction markets pose heightened harm by masquerading under "commercial legitimacy." *Id.* §§ I.21, II.1, II.11–18. Moreover, under RCW 19.190.030(2) and RCW 19.86.020, enticing Washingtonians with $25 bounties while omitting that participation violates RCW 9.46.240 and exposes users to disgorgement (RCW 4.24.070) is both a deceptive omission and unfair as contrary to public policy (RCW 9.46.010). Dkt. No. 28 ¶¶ 39, 68; *cf. Klem v. Wash. Mut. Bank*, 176 Wash. 2d 771, 785–87 (2013). The fact that Kalshi has not yet been enjoined for four non-sports/non-politics offerings does not cure an undifferentiated invitation to "trade on Kalshi," which steers consumers onto an unlicensed gambling exchange where even partial truth cannot defeat a misleading net impression at the Rule 12(b)(6) stage. *See Panag*, 166 Wash. 2d at 50–51 (explaining that even partially truthful statements may be deceptive when viewed in context because the CPA focuses on the overall net impression conveyed to consumers); Dkt. No. 28 ¶ 26; Dkt. No. 30 at 23–24.[6] Courts' use of trading vocabulary changes nothing: in the very decision Kalshi quotes, the Ninth Circuit held "the substance of the sports event contracts offered on Kalshi's DCM is sports gambling, regardless of whether Kalshi calls them swaps." *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1113 (9th Cir. 2026); *see Blue Lake*, 191 F.4th at 1082 (sports contracts likely class III gaming).

**E. Kalshi is liable for the Message's transmission.**

Kalshi's emphasis on Jennifer's selection of the recipient and messaging application overlooks the multiple ways in which Kalshi's involvement results in CEMA liability. RCW 19.190.020(1) reaches persons who initiate, conspire to initiate, or assist transmission of a commercial electronic mail message.

**i. Kalshi substantially assisted the transmission.**

Under RCW 19.190.010(1), Kalshi assisted in the transmission of the Message because, *inter alia*, it: (a) "provide[d] substantial assistance or support which enable[d Jennifer] to

[6] That being said, those offerings are also illegal.

formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message"; and (b) had scienter because it "[knew] or consciously avoid[ed] knowing that the initiator of the commercial electronic mail message . . . [was] engaged, or intend[ed] to engage, in any practice that violates the consumer protection act."

Kalshi designed the program, wrote its promotional language and title, generated referral links and images, encouraged sharing, and offered rewards for qualifying referrals. Dkt. No. 28 ¶¶ 22–28, 46–50, 56, 76–82. *Jensen* found assistance plausibly alleged where the business generated a referral link and content that customers were asked to copy and send; customer control over recipients, timing, and editing did not require dismissal. 2025 WL 606194, at *5–6. *Moore v. Robinhood Financial LLC* likewise upheld an assistance theory despite users' ultimate control over sending and editing. 2022 WL 3082969, at *3–4 (W.D. Wash. Aug. 3, 2022); *see also Bottoms v. Block, Inc.*, 2024 WL 1931690, at *3–4 (W.D. Wash. May 2, 2024) (same).

Kalshi further contends that even if it substantially assisted the Message, the FAC fails to plead the scienter element because Kalshi supposedly did not know in advance which medium Jennifer would select or that she would send the Message to a Washington resident specifically. Dkt. No. 30 at 19–20. That argument misreads the statute, ignores the FAC's concrete allegations, and has no support in case law.

First, Brown alleges abundant facts showing that Kalshi both knew and/or consciously avoided knowing that its users were transmitting referral messages via electronic mail platforms to Washington residents in violation of the CPA:

- Kalshi specifically markets its platform to Washington residents ("I found a way to bet on the NFL even though we live in Washington. . . . It's called Kalshi"), Dkt. No. 28 ¶ 13, offers wagering markets on Washington elections and sports, *id.* ¶¶ 14, 33, and actively promotes its "Refer a friend" bounty program to existing users located in Washington, who naturally have friends and family in Washington, *id.* ¶¶ 49, 51, 53;
- Kalshi "keeps track of which users send the links and which consumers click the referral links and fill out the form, which has included Washington residents"—giving

Kalshi direct, continuous actual knowledge that its referral links and pre-composed messages are repeatedly sent to and received by Washington residents, *id.* ¶¶ 49, 53;

- Kalshi's referral button allows sharing across electronic messaging platforms, and creates an invitation message that renders in Facebook Messenger (l.facebook.com), *id.* ¶¶ 25, 42–43, 56, 76–78; and
- Despite knowing that its users in Washington and nationwide are sending Kalshi referral messages to Washington residents, "Kalshi made no effort to warn its users against sending the referral link to consumers in Washington, or to prevent its Washington users from sending out the referral link." *Id.* ¶ 29; *see also id.* ¶¶ 40, 58–63, 67.

Second, Kalshi argues that it lacks scienter because a user can send the Kalshi-created referral link—which itself generates the "$25" graphic and the non-editable subject line *"Jennifer invited you to trade on Kalshi"*—across a variety of platforms, including SMS and social media messaging. Dkt. No. 30 at 8–10, 19–22; *see also* Dkt. No. 28 ¶¶ 56, 76–78, 80. While that distinguishes it from the four cases Kalshi cited, there is no requirement that Kalshi itself selects the message medium—not to mention the recipient or the ultimate wording of the message. The flexibility in Kalshi's Program actually militates towards scienter. Kalshi designed a Program with *more* ways to violate CEMA than if it had channeled invitations solely through SMS (RCW 19.190.060) or solely through electronic mail (RCW 19.190.020(1)(b)). If anything, designing a multi-channel referral engine could manufacture plausible deniability as to how a user transmits Kalshi's deceptive link, demonstrating conscious avoidance of a violation under RCW 19.190.010(1) and .030(2). There are, of course, only so many ways that a user can send Kalshi's electronic link. And Kalshi has every reason to expect that social media messaging would be one of them.

Finally, Kalshi ends by identifying several irrelevant distinctions in four cases and seemingly contending that substantial assistance requires that Kalshi "accessed or mined users' contacts, … used any such information to mass spam those contacts, or . . . otherwise facilitated

mass spamming."[7] Dkt. No. 30 at 22. None of these are requirements, whether by statute or case law.

**ii. Alternatively, Kalshi initiated the Message through agency or conspiracy.**

The allegations also support apparent authority because the principal's objective manifestations to the third party caused the third party to subjectively believe that the actor was authorized to act for the principal, and that belief was objectively reasonable. *See King*, 125 Wash. 2d at 507; Restatement (Third) of Agency § 2.03. Relying on *Sundstrom v. Ocean Reef Media LLC*, 2026 WL 1361646, at *4 (W.D. Wash. May 15, 2026), Kalshi argues that apparent authority cannot be established solely by what the sender says, and it contends that phrases like "Jennifer invited you" and "we'll both get $25" show Jennifer was acting only for herself. Dkt. No. 30 at 7, 18–19.

Both contentions ignore the face of the Message. Dkt. No. 28 ¶ 76. First, unlike *Sundstrom*—where no manifestation was traceable to the principal—the manifestations delivered to Brown's screen were authored, generated, and hosted by Kalshi itself: Kalshi composed the promotional script, generated the unique URL, created the "$25" green-chip graphic, and embedded the link-preview with the subject line, "Jennifer invited you to trade on Kalshi". *Id.* ¶¶ 25, 56, 76–80. Second, only Kalshi—not Jennifer personally—could grant Brown a $25 credit on Kalshi.com. *Id.* ¶ 80. The fact that the Message disclosed that Kalshi would pay $25 to *both* Brown (as a sign-up bonus) and Jennifer (as a referral commission) ( "Sign up for Kalshi with my link and we'll both get $25"), does not negate agency; it openly communicates that Kalshi has authorized and incentivized Jennifer to extend Kalshi's $25 promotional offer on Kalshi's behalf. *Id.* ¶¶ 4, 22–23, 48, 76, 80.

---

[7] In fact, the screenshot of Kalshi's mobile app in the FAC demonstrates both that Kalshi's "Refer a friend" screen includes a green "Search contacts" button alongside "Share link" and that Kalshi gamifies volume referrals with a scaled cap ("Invite a friend, get $10 / You can earn up to $1,500") and a 30-day forfeiture countdown ("You'll need to trade your bonus within 30 days or it will be forfeited back to Kalshi"). Dkt. No. 28 ¶ 24; *see also* id. ¶ 27. This directly contradicts Kalshi's assertion that no contact-search feature or volume-scaled referral incentive is pleaded. Dkt. No. 30 at 20–22. *Tellingly*, *Kalshi contends the Ta declaration exhibits contain the entire referral flow, but they omit the "Search contacts" function.*

*Ex post* ratification independently binds Kalshi. Dkt. No. 28 ¶ 49. In Footnote 8, Kalshi asserts that "[b]ecause, as already demonstrated, Jennifer possessed neither actual nor apparent authority under the facts alleged, any supposed 'ratification' is immaterial" under Restatement (Third) of Agency § 4.03. Dkt. No. 30 at 19 n.8. That turns agency law upside down. Rather, ratification supplies the legal consequences of actual authority *precisely when* the actor lacked prior authority, so long as (1) the actor "acted or purported to act as an agent on the person's behalf," Restatement (Third) of Agency § 4.03, and (2) the principal affirmed the act or knowingly accepted its benefits, *id.* § 4.01; *accord Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073–76 (9th Cir. 2019).

Both elements are squarely pleaded here. First, by transmitting Kalshi's sign-up link, Kalshi's "$25" graphic, and Kalshi's offer to credit Brown $25 upon signing up on Kalshi.com, Jennifer manifestly purported to extend a commercial promotion on Kalshi's behalf. Dkt. No. 28 ¶¶ 76–80. Second, Kalshi ratified its users' referral transmissions into Washington by tracking the geographic location of consumers who click the referral links and complete the sign-up form—which has included Washington residents—and accepting the benefits of those Washington referrals while making no effort to block or decline them. *Id.* ¶¶ 29, 49, 53.

Finally, contrary to Kalshi's assertion that Brown "does not (and cannot) allege any ... agreement between Kalshi and Jennifer," Dkt. No. 30 at 22, the FAC pleads an explicit quid pro quo agreement to transmit the challenged referral messages. Under elementary contract and conspiracy principles, Kalshi's standing offer to pay existing users a $25 bounty for recruiting friends using Kalshi's referral materials, Dkt. No. 28 ¶¶ 4, 22–27, combined with Jennifer's acceptance and performance of that offer by transmitting Kalshi's referral link and deceptive "invited you to trade on Kalshi" Message to Brown, *id.* ¶¶ 28, 60–61, 65, 75–80, formed a concrete agreement to accomplish a commercial objective through unlawful means.

**F. Communications Decency Act § 230 does not immunize Kalshi.**

Section 230 of the CDA does not immunize Kalshi from responsibility for allegedly unlawful content it created or materially developed, even if a user also contributed. *Fair Housing*





Kothari Law LLC
555 SE Martin Luther King Blvd
Suite 3022
Portland, OR 97214

*Council v. Roommates.Com, LLC*, 521 F.3d 1157, 1162–63, 1166–68 (9th Cir. 2008) (en banc). Brown alleges that Kalshi authored the precise challenged title, "[User] invited you to trade on Kalshi." Dkt. No. 28 ¶¶ 56, 78, 80. Kalshi's own authority denied immunity where a business composed the referral text its customer forwarded. *Jensen v. Capital One Financial Corp.*, 2025 WL 606194, at *3 (W.D. Wash. Feb. 25, 2025). Speculation that Jennifer edited other text does not defeat the allegation that Kalshi supplied the allegedly misleading representation. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 n.6, 1105 (9th Cir. 2009).

**G. Brown may seek prospective injunctive relief under CEMA.**

Count I seeks an injunction, not freestanding CEMA damages. Dkt. No. 28 ¶¶ 97–98. RCW 19.190.090(1) permits an action to enjoin further CEMA violations. *Wright v. Lyft, Inc.*, 189 Wash. 2d 718, 728 n.3 (2017). Federal equitable requirements nevertheless apply. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *Guzman v. Polaris Industries Inc.*, 49 F.4th 1308, 1312–13 (9th Cir. 2022). Brown seeks protection from future referrals, which retrospective damages for past messages would not provide. The distinction is recognized in *Clark v. Eddie Bauer LLC*, 2024 WL 177755, at *2-3 (9th Cir. Jan. 17, 2024) (unpublished), which reinstated prospective injunctive relief while affirming dismissal of retrospective equitable restitution claims under *Sonner*.

Kalshi separately challenges future injury. Dkt. No. 30 at 16–17 n.7. Brown alleges an ongoing program that already reached him through a personal contact and provides no mechanism to exclude him from further referrals. Dkt. No. 28 ¶¶ 29, 75–83, 97. Those allegations support an inference of continuing personal exposure, rather than reliance on a historical message count alone. *Dawson v. Porch.com*, 2024 WL 4765159, at *9 (W.D. Wash. Nov. 13, 2024), held at the motion-to-dismiss stage that the plaintiffs' allegations of past text messages did not plausibly support an inference that CEMA violations were ongoing, and therefore did not support injunctive relief. An injunction requires a sufficient likelihood of renewed personal injury, which these allegations of continuing exposure address. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018); Dkt. No. 28 ¶¶ 29, 49–54, 70, 83, 97, 106.

**H. Brown states a CPA claim.**

Kalshi's CEMA violations give rise to CPA claims for statutory damages. Kalshi does not dispute that CEMA violations under RCW 19.190.020 and .030 can be enforced via *per se* CPA claims carrying statutory damages for commercial emails under RCW 19.190.040(1). *See, e.g.*, *Old Navy*, 4 Wash. 3d at 586–88; *Wright*, 189 Wash. 2d at 730–32 (holding that a CEMA recipient recovers RCW 19.190.040(1)'s $500 statutory damages through the CPA and that "RCW 19.190.040 establishes the injury and causation elements of a CPA claim as a matter of law"). With respect to Brown's intertwined CEMA-CPA claim, Kalshi's sole challenge is whether Brown has pleaded a CEMA violation; Kalshi does not dispute that if Brown articulates a CEMA violation, he has satisfied the remaining elements of a CPA claim.[8] *See* Dkt. No. 30 at 24. Thus, Brown's above-described well-pleaded CEMA violations supply the CPA's unfair-act, commerce, and public-interest elements, and RCW 19.190.040 supplies statutory injury and causation. *Wright*, 189 Wash. 2d at 730–32. Brown accordingly need not allege that he signed up, wagered, or lost money to seek statutory relief for the Message.

**III. <u>The First Amendment Does Not Bar Brown's Claims</u>**

To the extent Kalshi's constitutional argument depends on its assertion that the challenged subject line is neither false nor misleading, Dkt. No. 30 at 25–26, it supplies no independent ground for dismissal. Accepting that assertion would defeat Brown's subject-line theory under CEMA without requiring a constitutional ruling. *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)

---

[8] Kalshi's focus on whether Brown signed up and used Kalshi avoids the issue. Kalshi's Article III standing argument is also premised on this limited reading of the FAC and is thus inapt. Nevertheless, Brown alleges he did not consent to receiving the Message, which consumed his time and device resources. Dkt. No. 28 ¶¶ 75–85. The nuisance and privacy harm recognized for unsolicited texts provides a close analogy. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990–91 (9th Cir. 2023). The Message's unsolicited personal intrusion upon Brown differs from the bare subject-line violation involving solicited emails in *Nuri v. True Religion Apparel, Inc.*, 2026 WL 864886, at *3 (W.D. Wash. Mar. 30, 2026). Brown's injury is traceable to Kalshi's creation and incentivized distribution of the Message and subject to statutory damages. Kalshi's objection to a separate gambling-loss claim therefore does not defeat the CEMA-based claims (including under RCW 19.190.030(2) and .040(1), Dkt. No. 28 ¶¶ 20, 67–71, 103).

(discussing constitutional avoidance). Conversely, Kalshi cannot obtain dismissal by assuming away the misleading impression plausibly alleged in the FAC. *See Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 474 n.1 (S.D.N.Y. 2020) (rejecting a First Amendment dismissal argument resting on the disputed premise that the advertising was not misleading).

Under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563–64, 566 (1980), actually or inherently misleading commercial speech receives no protection; but potentially misleading speech requires further scrutiny. *American Academy of Pain Management v. Joseph*, 353 F.3d 1099, 1106–08 (9th Cir. 2004). That distinction does not establish that Kalshi's solicitation falls into the protected category. Brown challenges the particular invitation's allegedly misleading presentation of unlawful Washington gambling as an apparently lawful commercial opportunity, without disclosing the illegality of the promoted transactions. Dkt. No. 28 ¶¶ 30–40, 56–57, 68, 76–80. The possibility of using "trade" truthfully elsewhere does not resolve that allegation. Indeed, Washington's Court of Appeals has upheld CEMA's application to deceptive subject lines against a First Amendment challenge, even if the words in the subject line are innocuous. *Heckel*, 122 Wash. App. at 70–72. Whether the evidence ultimately establishes actual or inherent deception remains a separate inquiry from whether Brown has plausibly pleaded it.

The unlawful-activity inquiry is distinct. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388–89 (1973), permits restrictions on commercial proposals for illegal transactions. *See also United States v. Williams*, 553 U.S. 285, 297 (2008). *Bigelow v. Virginia*, 421 U.S. 809, 822–25 (1975), protected advertising for services lawfully provided in another State. Here, the FAC alleges recruitment of Washington residents to participate from Washington in prohibited gambling. Dkt. No. 28 ¶¶ 13–14, 22–29, 30–40, 49–53. Identifying other, potentially lawful contracts does not establish that this solicitation promoted only lawful transactions.[9]

---

[9] Notably, Kalshi oversells the court's holding in the WA Injunction Order by suggesting it found four categories of Kalshi's offering lawful. Dkt. No. 30 at 26. The court merely did not

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97, 502 (1982), supports examining marketing context. There, proximity to illegal-drug-use literature helped identify merchandise marketed for illegal use. Here, the FAC depicts Kalshi's referral feature on the app on the same screen as illegal political and football wagers, along with tabs at the top for illegal categories such as "Sports" and "Politics." Dkt. No. 28 ¶ 24. Together with Kalshi's Washington-specific betting advertisements and referral incentives, that presentation supports the inference that the invitation recruits consumers for illegal gambling, notwithstanding the availability of other potentially lawful bets. *Id.* ¶¶ 13–14, 22–29.

Nor does "upstream" authorship establish immunity. Dkt. No. 30 at 25, 27. Brown alleges that Kalshi composed the challenged representation, generated the referral material, offered financial incentives, and knowingly assisted its actual transmission to him. Dkt. No. 28 ¶¶ 49–63, 75–80. Recognizing that composition is expressive activity does not resolve whether this commercial solicitation is protected. This claim concerns Kalshi's alleged participation in the unlawful completed transmission, rather than liability for composition alone.

Finally, even if the solicitation is merely potentially misleading and the underlying activity is legal, restricting the referral messages satisfies the *Central Hudson* factors. Imposing liability for Kalshi's knowing and substantial assistance in disseminating deceptive solicitations directly advances Washington's substantial interest in preventing consumer deception and unlawful commercial practices. *Cf. Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) (requiring the government to show that a commercial-speech restriction will alleviate the identified harm in a direct and material way). Indeed, Kalshi authored the challenged representation, supplied the referral link, and offered financial rewards to encourage recruitment. Dkt. No. 28 ¶¶ 22–28, 49–63, 75–80. Assistance liability addresses the commercial source of those solicitations and the incentives supporting their dissemination. Kalshi's reliance on *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250–53 (2002), is misplaced. Dkt. No. 30 at 27–28. That decision invalidated an

---

enjoin them, unlike all the other categories including "Sports," "Elections," "Politics," "Culture," "Tech and Science," and "Mentions" that it may no longer provide or advertise.

overbroad prohibition on protected expression justified by the possibility that viewers might later commit separate crimes; it did not apply *Central Hudson* to commercial speech. Here, Brown challenges Kalshi's knowing assistance in an actual, allegedly deceptive transmission—not expression that might inspire independent future misconduct. Nor does *Bolger v. Youngs Drug Products Corp.*'s rejection of a ban on truthful contraceptive advertisements to shield recipients from offense resolve this claim. 463 U.S. 60, 69–72 (1983). Describing Kalshi's participation as "upstream" does not establish that regulating its alleged role in producing and distributing deceptive solicitations provides only remote or speculative consumer protection.

Even if the referral advertisement warrants protection, CEMA's application survives intermediate scrutiny. *Central Hudson* asks whether the State's interest "could be served as well by a more limited restriction," 447 U.S. at 564, and requires a narrowly tailored fit, not the least restrictive conceivable means, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). Assistance liability is that more limited restriction. It attaches only to substantial assistance in an actual transmission from a Washington computer or to an address the sender knew or had reason to know belonged to a Washington resident. It also requires that Kalshi knew, or consciously avoided knowing, that the initiator was engaged in a CPA-violating practice. RCW 19.190.010(1), .020(1). Kalshi remains free to promote lawful transactions through truthful referral advertising. Kalshi's alternative of liability only for senders, Dkt. No. 30 at 28, does not restrict less speech. It suppresses the identical message, merely shifting liability from the company that composed and paid for it to the individual consumers who repeated it. Dkt. No. 28 ¶¶ 22–28, 47, 78. Nor would it serve Washington's interest "as well." CEMA already reaches initiators. But pursuing users one message at a time would leave Kalshi's template and bounties free to regenerate the deception across its network. *Id.* ¶¶ 47–53. Sender-only enforcement is an endless game of whack-a-mole that never reaches the source; assistance liability reaches that source directly, and only when Kalshi knowingly participates.

## IV. <u>The Class Allegations Should Not Be Stricken</u>

Kalshi has not shown that the FAC's class allegations are incurably deficient. On a pleading-stage motion to strike, the defendant bears the burden of establishing that the proposed class is not certifiable. *Sant v. RocketReach LLC*, 790 F. Supp. 3d 1145, 1156–57 (W.D. Wash. 2025). Particularly instructive is *Jensen*, 2025 WL 606194, at *6–7, which denied a motion to strike class allegations challenging another CEMA Program despite concerns about individualized consent inquiries, identifying members, and an allegedly fail-safe definition. Even Kalshi's cited *Hoffman v. Hearing Help Express, Inc.*, 2020 WL 4729176, at *2 (W.D. Wash. Mar. 27, 2020), denied the motion to strike, recognizing that certification ordinarily should be addressed after discovery.

Kalshi relies on this Court's order in *Nuri v. True Religion Apparel, Inc.*, 2026 WL 864886, at *3 (W.D. Wash. Mar. 30, 2026), to argue that the class definition might sweep in Washingtonians who "solicited or welcomed the referral" or signed up for Kalshi. Dkt. No. 30 at 29. In *Nuri*, however, there was *"no allegation that any of the relevant emails were unsolicited,"* and the plaintiff never alleged that she opened the emails, lost time, or suffered any concrete harm beyond a bare statutory violation. 2026 WL 864886, at *1–3. Here, by contrast, Kalshi's "Refer a friend" Program targets non-users, and the FAC expressly alleges that recipients **"have not consented to receive these messages at all"** and suffer concrete Article III injury through wasted time, depletion of device storage, and computational resources. Dkt. No. 28 ¶¶ 73, 85; *see also id.* ¶¶ 12, 55, 75, 79; *Van Patten*, 847 F.3d at 1043. Moreover, any Washington recipient who was deceived by the referral into signing up and wagering on Kalshi's unlawful platform suffered *additional* concrete reliance and financial harm—not a lack of injury. *See* Dkt. No. 28 ¶¶ 38–39, 68.

Kalshi's ascertainability objection likewise confuses objective membership criteria with the means of proving membership. The Ninth Circuit rejects a freestanding administrative-feasibility prerequisite, while addressing definitional and manageability concerns through Rule 23's enumerated requirements. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4, 1126 (9th Cir. 2017). The proposed class turns on identifiable facts: receipt of the referral message,

Washington residence, and the applicable period. Dkt. No. 28 ¶ 87. Discovery can establish how Kalshi's alleged referral and geographic tracking records, together with recipient evidence, identify members and permit common proof. *Id.* ¶¶ 49, 53, 90–91. *Cashatt v. Ford Motor Co.*, 2021 WL 1140227, at *2–3 (W.D. Wash. Mar. 24, 2021), involved materially different defects: individualized medical causation and a definition conditioning membership on injury caused by carbon-monoxide exposure. Brown's definition does not condition membership on prevailing against Kalshi.

Brown will bear the burden of satisfying Rule 23 at certification. For now, discovery should determine the availability of common proof and any necessary narrowing. Whether the class is potentially overinclusive should be addressed by refining the definition rather than denying certification outright. *See Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 & n.13–14 (9th Cir. 2022) (en banc). Kalshi's premature motion should therefore be denied.

## CONCLUSION

The Court should deny Defendant's motion. Alternatively, Brown requests the focused jurisdictional discovery described above or leave to amend any curable pleading deficiency.

Dated: November 13, 2026

Respectfully submitted,

By: /s/Jonathan D. Grunberg

By: /s/Natalya P. Maze

Natalya P. Maze
npm@mazelawgroup.com
MAZE LAW GROUP PLLC
1600B SW Dash Point Rd. #127
Federal Way, WA 98023
Telephone: 206-355-6314

Vivek Kothari (admitted *pro hac vice*)
vivek@kothari.law
KOTHARI LAW
555 SE Martin Luther King Blvd.
Portland, OR 97214

Telephone: 503-567-6735

Jonathan D. Grunberg (admitted *pro hac vice*)
jgrunberg@wgwlawfirm.com
WADE, GRUNBERG & WILSON, LLC
3100 Cumberland Blvd SE,
STE. 1130
Atlanta, GA 30339
Telephone: 404-600-1153

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7(e)(4), I certify that this memorandum contains 8,372 words and therefore does not exceed 8,400 words.

Dated: November 13, 2026

Respectfully submitted,

By: */s/Jonathan D. Grunberg*



Kothari Law LLC
555 SE Martin Luther King Blvd
Suite 3022
Portland, OR 97214

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2026, due to a scheduled maintenance outage of the Court's CM/ECF system, I caused the foregoing document to be filed with the Clerk of the Court via electronic mail at filing@wawd.uscourts.gov pursuant to the Court's Electronic Filing Procedures, and served a true and correct copy of the same via electronic mail upon the following counsel of record for Defendant Kalshi Inc.:

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Matthew Hosen (matthosen@quinnemanuel.com)
Avi Perry (aviperry@quinnemanuel.com)
Rachel Frank Quinton (rachelquinton@quinnemanuel.com)
John W. Baumann (jackbaumann@quinnemanuel.com)
Nicolas G. Keller (nicolaskeller@quinnemanuel.com)

*Counsel for Defendant*

Additional service will be provided by CM/ECF after the outage, at which time, this document will be docketed by the court staff.

Dated: November 13, 2026 By: */s/Jonathan D. Grunberg*